## ALLEGHANY CORPORATION ET AL. *v.*
## BRESWICK & CO. ET AL.

NO. 36.

Argued January 23–24, 1957.—Decided April 22, 1957.

*Whitney North Seymour* argued the cause for the Alleghany Corporation, appellant in No. 36. With him on the brief were *David Hartfield, Jr., Edward K. Wheeler, Robert G. Seaks* and *Morton Moskin.*

*Harold H. Levin* argued the cause for Gruss et al., appellants in No. 36. With him on the brief were *Joseph M. Proskauer* and *Allen L. Feinstein.*

*Alexander Kahan* argued the cause for Neuwirth, appellant in No. 36. With him on the brief was *Arthur W. Lichtenstein.*

*Robert W. Ginnane* argued the cause for the Interstate Commerce Commission, appellant in No. 114. With him on the brief was *B. Franklin Taylor, Jr.*

*George Brussel, Jr.* argued the cause for Breswick & Co. et al., appellees. *Randolph Phillips,* appellee, argued the cause *pro se.* They filed a brief in Nos. 36 and 114.

*Edward M. Garlock* filed a Statement in Opposition to Appellees' Motion to Dismiss for Baker, Weeks & Co. et al., appellants in No. 82.

*Solicitor General Rankin, Assistant Attorney General Hansen* and *Daniel M. Friedman* filed a brief for the United States.

*Thomas G. Meeker, Joseph B. Levin* and *Aaron Levy* filed a brief for the Securities and Exchange Commission, as *amicus curiae.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These are direct appeals under 28 U. S. C. § 1253 from a final judgment of a three-judge District Court for the Southern District of New York setting aside orders of the Interstate Commerce Commission and restraining appellant Alleghany Corporation from issuing a new class of preferred stock that had been approved by the Commission. The case raises numerous questions regarding the jurisdiction and powers of the Commission, especially under § 5 of the Interstate Commerce Act, for the understanding of which a rather detailed statement of the facts is necessary.

Section 5 (2)(a), in its pertinent portions, provides: "It shall be lawful, with the approval and authorization

of the Commission . . . (i) . . . for a person which is not a carrier to acquire control of two or more carriers through ownership of their stock or otherwise; or for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise . . . ." 54 Stat. 899, 905, 49 U. S. C. § 5 (2) (a).[1]

Appellant Alleghany Corporation is a Maryland corporation whose charter provides for extensive powers of investment under no express limitation. After the passage of the Investment Company Act of 1940, 54 Stat. 789, 15 U. S. C. § 80a–1 *et seq.,* Alleghany registered as an investment company with the Securities and Exchange Commission. In 1944, in connection with an application by the Chesapeake & Ohio Railroad for approval by the Interstate Commerce Commission of acquisition of the property of the Norfolk Terminal & Transportation Com-

---

[1] Section 5 (3) provides: "Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2), to acquire control of any carrier or of two or more carriers, such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier subject to such of the following provisions as are applicable to any carrier involved in such acquisition of control: Section 20 (1) to (10), inclusive, of this part, sections 204 (a) (1) and (2) and 220 of part II, and section 313 of part III, (which relate to reports, accounts, and so forth, of carriers), and section 20a (2) to (11), inclusive, of this part, and section 214 of part II, (which relate to issues of securities and assumptions of liability of carriers), including in each case the penalties applicable in the case of violations of such provisions. In the application of such provisions of section 20a of this part and of section 214 of part II, in the case of any such person, the Commission shall authorize the issue or assumption applied for only if it finds that such issue or assumption is consistent with the proper performance of its service to the public by each carrier which is under the control of such person, that it will not impair the ability of any such carrier to perform such service, and that it is otherwise consistent with the public interest." 54 Stat. 907, 49 U. S. C. § 5 (3).

pany, Alleghany, alleging that it controlled the Chesapeake & Ohio, filed a supplementary application with the Commission joining the Chesapeake & Ohio's application and seeking approval of its own acquisition of control of the Terminal Company through the action of the Chesapeake & Ohio. In 1945, the Commission approved "acquisition of control" of the Terminal Company by the Chesapeake & Ohio and Alleghany as a transaction within § 5 (2) and further found that Alleghany "shall be considered as a carrier subject to the [reporting and securities] provisions of section 20 (1) to (10) and section 20a (2) to (11) of the act." 261 I. C. C. 239, 262.

Shortly thereafter, under the provisions of § 3 (c)(9) of the Investment Company Act,[2] the Securities and Exchange Commission held that Alleghany was no longer an investment company within the meaning of the Investment Company Act. 20 S. E. C. 731.

In March, April, and May 1954, several petitions and complaints were filed with the Interstate Commerce Commission by the New York Central Railroad, a stockholder, a protective committee, and bondholder creditors of the Central, asserting violations of the law in Alleghany's purchases of New York Central stock. In view of statements by Alleghany and Chesapeake & Ohio officials that Alleghany had disposed of its holdings of Chesapeake stock, that Commission, in June, ordered Alleghany to show cause why the 1945 order providing that Alleghany

---

[2] "Notwithstanding subsections (a) and (b), none of the following persons is an investment company within the meaning of this title:

.         .         .         .         .

". . . Any company subject to regulation under the Interstate Commerce Act, or any company whose entire outstanding capital stock is owned or controlled by such a company: *Provided,* That the assets of the controlled company consist substantially of securities issued by companies which are subject to regulation under the Interstate Commerce Act." 54 Stat. 789, 799, 15 U. S. C. § 80a-3 (c)(9).

should be "considered as a carrier" should not be set aside. Alleghany replied that it would accept an order terminating its control of the Chesapeake & Ohio but requested delay until it could file a new application which, it alleged, would require the Commission's approval and continuance of its status as a non-carrier to be "considered as a carrier" under the Interstate Commerce Act.

The present proceedings were commenced by the filing of such an application by Alleghany and Central—after the ousting of the old Central management in May in a proxy fight. The contents of the application were described fully in the Report of Division 4 of the Commission:

"The Cleveland, Cincinnati, Chicago and St. Louis Railway Company [the Big Four], the Louisville & Jeffersonville Bridge and Railroad Company [the Bridge Company or the Jeffersonville], The New York Central Railroad Company, and the Alleghany Corporation . . . on September 20, 1954, jointly applied under section 5 (2) of the Interstate Commerce Act . . . for approval and authorization of (1) (a) merger of the properties and franchises of the Jeffersonville into the Big Four for ownership, management, and operation; and (b) modification of the lease of January 2, 1930, under which Central, as lessee, operates the property of Big Four, lessor, to give effect to the acquisition of additional property pursuant to the proposed merger of Jeffersonville into Big Four; (2) acquisition by Central and Alleghany, by virtue of their control of Big Four, of control of the properties of Jeffersonville; and (3) continuation of Alleghany's status as a carrier subject to the provisions of section 20 (1) to (10), inclusive, and 20a (2) to (11), inclusive, of the act, as provided by section 5 (3) ·thereof." 290 I. C. C. 725–726.

The Big Four already owned all the capital stock of the Jeffersonville. The Big Four itself had ceased to be an operating carrier in 1930; since then the New York Central has operated it as lessee. In addition, the New York Central owns 98.98% of the common, and 86.45% of the preferred, stock of the Big Four.

On March 2, 1955, Division 4 of the Commission approved and authorized the merger of the Jeffersonville into the Big Four; approved continued control of the properties and franchises of the Jeffersonville by the Central and Alleghany; modified the lease between the Big Four and the Central; continued Alleghany as a non-carrier to be "considered as a carrier" subject to the reporting and securities provisions of the Act; and terminated the effective portions of the 1945 order in the Chesapeake & Ohio proceeding. 290 I. C. C. 725.

On reconsideration, the whole Commission on May 24, 1955, affirmed the conclusions of Division 4. It held that Alleghany had acquired control over Central; that at the time the present application was filed, Alleghany was in fact "a person not a carrier which controlled an established system"; that the acquisition of control over the Central was not within § 5 (2)'s requirement of Commission approval; that the rearrangement by Central of its ownership or control of its subsidiaries was within § 5 (2)'s requirement of approval by the Commission and that Alleghany as the controlling party was a necessary party; and that the terms and conditions of the transactions were fair and reasonable. Rejecting the suggestion of the Securities and Exchange Commission, which had intervened, the whole Commission also held that it had no discretion to yield jurisdiction over Alleghany to the former agency.[3] 295 I. C. C. 11.

---

[3] On this appeal, the Securities and Exchange Commission, as *amicus*, took no position on whether the District Court "correctly construed the relevant provisions of the Interstate Commerce Act

Subsequent to their application with respect to the Jeffersonville, Alleghany and Central, on December 17, 1954, filed an application under § 5 (2) to "acquire control" of the Boston & Albany Railroad Company, the Pittsfield and North Adams Railroad Corporation, and the Ware River Railroad Company through purchase by Central of their capital stock. The Central owned a little more than 16% of the Pittsfield's capital stock and none of the capital stock of the other two railroads. It operated the properties of the Boston & Albany, the Pittsfield, and the Ware River under leases due to expire in 1999, 1975, and 2873 respectively. On March 22, 1955, less than three weeks after it had approved the application in the Jeffersonville proceeding, Division 4 of the Commission approved the acquisition of such control by Alleghany and Central. (Opinion not reported.)

A third application filed by Alleghany, on February 18, 1955, sought permission from the Commission to issue a new 6% convertible preferred stock pursuant to a charter amendment, approved by all classes of Alleghany's stockholders, that permitted consummation of Alleghany's proposed plan of allowing its outstanding cumulative 5½% preferred stock to be exchanged for the new stock. On May 26, 1955, two days after the whole Commission affirmed Division 4's orders in the Jeffersonville proceeding, Division 4 approved the new stock issue (conditioning its approval on modification of one term), and on June 22, the full Commission denied reconsideration.

An action was then brought before a three-judge District Court by minority common stockholders of Alleghany to require the Commission to set aside its order granting Alleghany the status of a non-carrier to be "con-

---

or orders of the ICC thereunder; nor on the extent of the jurisdiction of the court below." The views of the Securities and Exchange Commission were set forth only in relation to issues under the Investment Company Act.

sidered as a carrier" and its subsequent order approving
the new class of preferred stock and to restrain Alleghany
from issuing the new preferred stock. The three-judge
District Court, convened under the Urgent Deficiencies
Act, 28 U. S. C. §§ 1336, 1337, 2321–2325, granted first a
preliminary injunction, 134 F. Supp. 132 (Circuit Judge
Hincks, dissenting), and then a permanent injunction
setting aside the Commission's order designating Alle-
ghany as a "carrier" and also its order approving
Alleghany's new class of preferred stock, restraining its
issue. 138 F. Supp. 123.[4]

Alleghany moved for a new trial based on the "acquisi-
tion of control" involved in the Boston & Albany pro-
ceeding. The District Court held that the Commission's
order in that proceeding gave no validity to the orders in
the Jeffersonville proceeding because of the Commission's
failure to provide specifically in its Boston & Albany
order that Alleghany should be "considered as a carrier."
138 F. Supp., at 138. On appeal here from the final judg-
ment below, we noted probable jurisdiction. 351 U. S.
903, 352 U. S. 816.

Alleghany urges initially that the Commission's orders
dealing with its status under the Interstate Commerce
Act and dealing with its new preferred stock were not
reviewable at the suit of appellees, that appellees had no
standing. We find that appellees do have standing to
challenge these orders. This is not a case where "the
order under attack does not deal with the interests of

[4] After the preliminary injunction was granted, Alleghany moved
in the District Court for suspension of the injunction pending appeal
to this Court. The two judges who heard the motion divided, and
the motion was therefore denied. On application to Circuit Justice
Harlan, a stay was granted with respect to that portion of the new
preferred stock that had been issued before the District Court's
injunction was granted. 75 S. Ct. 912. The New York Stock
Exchange, however, continued to suspend trading in the new preferred
stock.

investors," or where the "injury feared is the indirect harm which may result to every stockholder from harm to the corporation." *Pittsburgh & W. Va. R. Co.* v. *United States,* 281 U. S. 479, 487. The appellees are common stockholders of Alleghany. The new preferred stock issue approved by the Commission is convertible, and under relevant notions of standing, the threatened "dilution" of the equity of the common stockholders provided sufficient financial interest to give them standing. See *American Power & Light Co.* v. *SEC,* 325 U. S. 385, 388–389.

Having acquired standing to institute proceedings in the District Court by virtue of the threatened financial injury, appellees could also attack the order of the Commission conferring on Alleghany the status of a person not a carrier but to be "considered as a carrier." The status order was a source of the threatened financial injury. If the Commission acted out of bounds in decreeing its status order, it had no power to approve the new preferred stock issue and the plaintiffs would be entitled to relief.[5]

This brings us to the substantive issues in the litigation. In the main, these involve the jurisdiction of the Com-

---

[5] See *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 144, where the fact that the "contested order determining the status of the Rochester necessarily and immediately carried direction of obedience to previously formulated mandatory orders addressed generally to all carriers . . . in conjunction with the other orders, made determination of the status of the Rochester a reviewable order of the Commission." Whether reviewability of a status order, without more, be deemed a matter of standing to review or a matter of finality of administrative action, the basis for decision is the same: has the action of the administrative agency threatened the interests of the complainant, whether corporation or, as here, stockholder otherwise qualified to sue, sufficiently to allow attack? (This does not mean of course that the same agency action that allows attack by one allows attack by the other.)

mission under §§ 5 (2) and 5 (3) of the Act, defining its powers.[6] The validity of the status order under § 5 (3) turns on compliance with the statutory requirement of § 5 (2) of Commission approval "for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise . . . ." Appellants Alleghany and the Commission contend that the Jeffersonville and the Boston & Albany transactions both support the Commission's assertion of jurisdiction. The District Court disagreed with respect to the former and, as we have seen, p. 159, *supra,* found it unnecessary to pass on the latter.

Whether the Jeffersonville transaction met the statutory requirement of § 5 (2) raises three questions. (1) Was Commission approval of Alleghany's acquisition of control over Central required? (2) Did Alleghany in fact control Central? (3) Did the Jeffersonville transaction involve an acquisition of control by Alleghany over the properties of the Jeffersonville?

The District Court held that whatever control Alleghany had over Central did not fit within the statutory requirement of "a person which is not a carrier and which has control of one or more carriers" because the Commission had not given the approval necessary for acquisition of control of Central and its subsidiaries, "two or more carriers."

The Commission and Alleghany contend that Commission approval of the acquisition of a single, integrated system is not necessary. We need not decide this question, however, and intimate no opinion on it, for even if such approval is necessary, the statutory requirement of "a person which is not a carrier and which has control of one or more carriers" refers to "control" and not

---

[6] A brief summary of the history of § 5 is set forth in *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, 315 (appendix).

to "approved control." There seems to be no reason to read in the word "approved." Such a holding would mean that the failure of a company engaging in a transaction requiring Commission approval to apply for that approval would deprive the Commission of jurisdiction. Remedies against a violator are provided by § 5 (7), (8), and (9) of the Act. To punish a violator by depriving the Commission of jurisdiction over it would be indeed quixotic. As the Commission points out, the problem would appear clearer were Alleghany contesting, rather than acquiescing in, its jurisdiction.

Control in fact then is sufficient to satisfy the requirement of § 5 (2). Division 4 of the Commission reported the following:

> "The capital stock of Central is widely held by the public, but control of its functions reposes in Alleghany and its officers as a result of a proxy contest preceding a stockholders' meeting of May 26, 1954, at which the nominees chosen by Alleghany were elected as Central's board of directors. Alleghany has an undivided half interest in 600,000 shares of Central stock with voting rights to the 600,000 shares under joint-venture agreements, and in addition, owns 15,500 shares. The voting rights of Alleghany represent almost 10 percent of the total shares of Central stock outstanding. The chairman of the board of directors of Alleghany, who holds the same position with Central, beneficially owns 100,200 shares of the latter's stock. The president of Alleghany is a director of Central, and beneficially owns 300,100 shares of the latter's stock. A vice president of Alleghany holds a similar position with Central." 290 I. C. C., at 727.

Division 4 recognized that "the present control of the Central system has passed to Alleghany by regular corporate procedures . . . ." *Id.*, at 741.

The full Commission reached this conclusion:

"The contention that Alleghany does not control the individual directors on Central's board ignores the realities of the situation. Alleghany and its allied interests have succeeded in electing sufficient members of the board to permit them to organize and elect their own officers. Clearly the tenure in office of such directors who permitted this action depends upon their conformance to the views of the stockholders who elected them. In our opinion the power thus reposing in Alleghany constitutes control of Central." 295 I. C. C. 11, 16.

The District Court, however, held that "if the Commission's opinions contain a conclusion that Alleghany is in control of New York Central, those opinions lack sufficient findings to support that conclusion." 134 F. Supp., at 147. It noted that the order of Division 4 "discloses the fact that Alleghany's beneficial holdings of the Central stock are less than the combined individual holdings of Kirby, Young, Richardson and the Murchison group," and concluded that "the findings do no more than say that Alleghany, with someone else, controls New York Central. They do not even say whether the someone else, alone, has control." *Ibid.*

We think that the District Court took too restricted a view of what constitutes "control." In 1939, in *Rochester Telephone Corp.* v. *United States*, 307 U. S. 125, 145–146, arising under the Federal Communications Act, 48 Stat. 1064, 1065, 47 U. S. C. § 152 (b), this Court rejected artificial tests for "control," and left its determination in a particular case as a practical concept to the agency charged with enforcement.[7] This was the broad scope

---

[7] "Investing the [Federal Communications] Commission with the duty of ascertaining 'control' of one company by another [as the basis for the Commission's jurisdiction], Congress did not imply

designed for "control" as employed by Congress in the Transportation Act of 1940, 54 Stat. 899–900, 49 U. S. C. § 1 (3)(b).[8]  See *United States* v. *Marshall Transport Co.*, 322 U. S. 31, 38.

That Act also added § 1 (3)(b) to the Interstate Commerce Act, providing:

> "For the purposes of [section] 5 . . . of this Act, where reference is made to control (in referring to a relationship between any person or persons and another person or persons), such reference shall be construed to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect

artificial tests of control. This is an issue of fact to be determined by the special circumstances of each case. So long as there is warrant in the record for the judgment of the expert body it must stand. The suggestion that the refusal to regard the New York ownership of only one third of the common stock of the Rochester as conclusive of the former's lack of control of the latter should invalidate the Commission's finding, disregards actualities in such intercorporate relations. Having found that the record permitted the Commission to draw the conclusion that it did, a court travels beyond its province to express concurrence therewith as an original question. 'The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' *Mississippi Valley Barge Line Co.* v. *United States,* 292 U. S. 282, 286–287; *Swayne & Hoyt, Ltd.* v. *United States,* 300 U. S. 297, 303, et seq." 307 U. S., at 145–146.

[8] "This phrase ["control"] has been used because it has recently had the benefit of interpretation by the Supreme Court in the case of *Rochester Telephone Corp.* v. *United States* (307 U. S. 125, decided April 17, 1939)." H. R. Rep. No. 2832, 76th Cong., 3d Sess. 63. (This was the Conference Report.)

means; and to include the power to exercise control."
54 Stat. 899–900, 49 U. S. C. § 1 (3) (b).

Section 1 (3) (a) provides:

> "The term 'person' as used in this part includes an
> individual, firm, copartnership, corporation, com-
> pany, association, or joint-stock association; and
> includes a trustee, receiver, assignee, or personal rep-
> resentative thereof." 54 Stat. 899, 49 U. S. C.
> § 1 (3) (a).

The Commission's findings, setting forth the events sur-
rounding the proxy fight for control of Central, the com-
mon directors in both, the stockholdings of Alleghany's
officers and stockholders in Central, and the sworn state-
ment of Central in the Central-Alleghany application that
Central is controlled by Alleghany amply support its con-
clusion that "control" of Central was in Alleghany. See
footnote 7, *supra*.

The question remains whether the second portion of
the statutory requirement of Commission approval "for
a person which is not a carrier and which has control of
one or more carriers to acquire control of another carrier
through ownership of its stock or otherwise . . ." has
been met. What constitutes an acquisition of control?
The District Court gave this restricted interpretation:

> "A merger of carriers may involve an acquisition
> of control by a non-carrier, where, through the
> merger, the non-carrier acquires control (direct or
> indirect) of a carrier or carrier property which the
> non-carrier had previously not controlled; United
> States v. Marshall Transport Co., 322 U. S. 31 . . . .
> But where, as in the instant case, the non-carrier
> (Alleghany) is (according to our assumption, argu-
> endo) already in indirect control of a carrier (Bridge
> Company), and the merger still leaves the non-carrier

in indirect control of such property, no acquisition by the non-carrier results from the merger. . . ." 138 F. Supp., at 127–128.[9]

We think that this is too narrow a reading of the statute. Not labels but the nature of the changed relation is crucial in determining whether a rearrangement within a railroad system constitutes an "acquisition of control" under § 5 (2).

The Court has already considered twice what constitutes an "acquisition of control" under the Interstate Commerce Act. In *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, the Court interpreted § 5 (2) as it read in the Transportation Act of 1920, 41 Stat. 456, 481:

> "Whenever the Commission is of opinion . . . that the acquisition, to the extent indicated by the Commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the Commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the Commission to be just and reasonable in the premises."

In that case the order of the Commission permitting the New York Central Railroad to acquire control, by lease,

---

[9] The United States, which had supported the orders of the Interstate Commerce Commission in the District Court proceedings, on this appeal has taken the position that the judgment of the District Court should be affirmed because the merger of the Jeffersonville into the Big Four did not involve an "acquisition of control" over the Jeffersonville by Alleghany.

of the railroad systems of the Big Four and the Michigan Central Railroad Companies, was under review. Minority stockholders contended, *inter alia,* that the Commission could not authorize "acquisition of control" by lease since the Central had already acquired control of both railroads by stock ownership. The Court held that the "disjunctive phrasing of the statute 'either under a lease or by the purchase of stock' must be read in the light of its obvious purpose and cannot be taken to mean that one method must be exclusive of the other." 287 U. S., at 23. Nowhere did it intimate that the lease was not an "acquisition of control," even though the Central already had stock ownership control of both railroads. In fact, the refusal to set aside the Commission's order necessarily involved approval of the Commission's finding of an "acquisition of control," and the Court further stated:

> "The public interest is served by economy and efficiency in operation. If the expected advantages are inadequately secured by stock ownership and would be better secured by lease, the statute affords no basis for the contention that the latter may not be authorized although the former exists. The fact that one precedes the other cannot be regarded as determinative if the desired coordination is not otherwise obtainable." *Ibid.*

The Transportation Acts of 1933, 48 Stat. 211, and 1940, 54 Stat. 898, rewrote § 5 but retained the "acquisition of control" language, except that the phrase relating to method of acquisition—"under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system"—became, for acquisitions by both carriers and non-carriers, an all-inclusive phrase in the 1940 Act—"through ownership of their stock or otherwise." These changes do not lessen the authority of the *New York Central Securities* case in the scope to be given to an "acquisition of control."

In *United States* v. *Marshall Transport Co.*, 322 U. S. 31, the Court interpreted § 5, as amended by the 1940 Act, 54 Stat. 899, 905, 49 U. S. C. § 5. The Court held that the non-carrier parent (Union) of a carrier (Refiners) that proposed to purchase the property and franchises of another carrier (Marshall) "acquired control" of the property and franchises of the vendor and was therefore subject to the Commission's jurisdiction. The substantive issues in that case were of course different from those of the present case, since there had been no prior relation between the non-carrier parent and the vendor-carrier. In reaching its decision, however, the Court was explicit regarding the purpose of § 5:

> "It is not doubted that if Union, having control of Refiners, sought to acquire stock control of Marshall, Union would be required by § 5 (2)(b) to apply for the Commission's authority to do so. But it is said that having control of Refiners, Union may, by procuring Refiners' compliance with the purchase provisions of the statute alone, extend its control indefinitely to other carriers merely by directing the purchase of their property and business by Refiners, without subjecting itself to the jurisdiction of the Commission as provided in § 5 (3), so long as Union does not act directly as the purchaser of the property or of a controlling stock interest in such other carriers.
>
> "We think that neither the language nor the legislative history of the statute admits of so narrow a construction. Section 5 (4) makes it unlawful, without the approval of the Commission as provided by § 5 (2)(a), for a person which is not a carrier and which has control of one or more carriers to acquire control of another carrier through ownership of its stock or otherwise. Not only is this language broad

enough in terms to embrace the acquisition of control by a non-carrier through the purchase, by a controlled carrier, of the property and business of another carrier, but the legislative history indicates that such was its purpose." *Id.,* at 36–37. See also *id.,* at 37–40.

In other words, a non-carrier may not gain "control" over carriers free of Commission regulation merely by operating through subsidiaries.

The crux of each inquiry to determine whether there has been an "acquisition of control" is the nature of the change in relations between the companies whose proposed transaction is before the Commission for approval. Does the transaction accomplish a significant increase in the power of one over the other, for example, an increased voice in management or operation, or the ability to accomplish financial transactions or operational changes with greater legal ease? This is the issue, and not the immediacy or remoteness of the parent from the proposed transaction, for, as we said in the *Marshall Transport* case, the parent can always, by operating through subsidiaries, make itself more remote. In deciding this type of issue, of course, the finding of the Commission that a given transaction does or does not constitute a significant increase in the power of one company over another is not to be overruled so long as "there is warrant in the record for the judgment of the expert body . . . ." *Rochester Telephone Corp.* v. *United States,* 307 U. S. 125, 146.

The principal issue, therefore, in the Jeffersonville proceeding is not Alleghany's remoteness from, or closeness to, the proposed transaction but rather the nature of the proposed transaction itself. The Big Four, whose stock was largely owned by Central, owned all the stock of the Jeffersonville. (By agreement between the Big Four and the Central, this stock was held by the Central.) The proposal was to merge the Jeffersonville into the Big

Four.  While the immediate practical effects of the merger on the operation of the Jeffersonville might be small, even minimal, a merger is the ultimate in one company obtaining control over another.  So long as the Jeffersonville existed as a separate company, there was always the possibility that the Big Four, through the Central, might sell, or be forced to divest itself of, the Jeffersonville stock, and that the control of the Jeffersonville might thus pass to another railroad.  In considering this possibility, it is important to note that the Jeffersonville does not connect physically with the Big Four but connects with it only by virtue of the Big Four's trackage rights over the Baltimore & Ohio, and that the Jeffersonville, with its few miles of track, also connects with the Pennsylvania, Baltimore & Ohio, Louisville & Nashville, Illinois Central, and Chesapeake & Ohio Railroads.

The merger of the Jeffersonville into the Big Four virtually precludes any change in the relation of the Jeffersonville lines to the Central system.  The Jeffersonville will be no more.  In view of this, it cannot reasonably be said that there has been no increase in the power of the Big Four, the Central, and, through its relation with them, Alleghany over the Jeffersonville.  While it is not always profitable to analogize "fact" to "fiction," La Fontaine's fable of the crow, the cheese, and the fox demonstrates that there is a substantial difference between holding a piece of cheese in the beak and putting it in the stomach.

Denial of power to the Commission to regulate the elimination of the Jeffersonville from the national transportation scene would be a disregard of the responsibility placed on it by Congress to oversee combinations and consolidations of carriers and "to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers . . ." and the further requirement that "All of the provisions of this Act shall be administered

and enforced with a view to carrying out the above declaration of policy." National Transportation Policy, 54 Stat. 899, 49 U. S. C., preceding § 1. We hold that the Commission was justified in finding that the merger of the Jeffersonville into the Big Four involved an "acquisition of control" of the Jeffersonville by Central and Alleghany within the meaning of § 5 (2) of the Act. Since the status order of the Commission is supportable by virtue of the Jeffersonville proceeding, we need not consider the District Court's denial of Alleghany's motion, based on the Boston & Albany proceeding, for a new trial.

Several other matters urged by appellees remain to be considered. Appellees contend that Alleghany did not acquire control of any carrier in the Jeffersonville proceeding since the application was made by the Big Four as lessor and the Central as lessee and that therefore the Big Four was a statutory lessor and not a carrier within § 5. We need not discuss the distinction that appellees seek to assert between lessors and carriers, for the Jeffersonville, the railroad whose control we have held was acquired by Alleghany, was an operating carrier.

Appellees also urge that the *Marshall Transport* case, 322 U. S. 31, requires dismissal of Alleghany's application because two stockholders, alleged to dominate Alleghany, did not join in the application and therefore in the absence of those two indispensable parties, the Commission had no jurisdiction to proceed. But in the *Marshall Transport* case, the Commission was refusing to approve a subsidiary's application to acquire control of the property and operating rights of another carrier unless the non-carrier parent submitted itself to the Commission's jurisdiction, and the Court upheld the Commission's power to refuse to approve the application.

Although the Court in that case used language of "jurisdiction," the problem is not strictly jurisdictional in the sense that if the Commission wrongly decides that

corporation or person A does not "control" non-carrier B (which is "considered as a carrier") and therefore that A need not join B's application to acquire control of C, the Commission loses jurisdiction over B, the power to regulate B. The Commission's jurisdiction over a non-carrier depends on whether the activities of the non-carrier fall within § 5 (2) and (3) and does not depend on the action of the parent. For example, if Alleghany were contending that it could reshuffle the whole Central system without Commission approval, alleging that the Commission had no jurisdiction over it through failure to join two stockholders controlling it in the original status order proceedings, this whole problem would appear in a clearer context. The basis of the Commission's jurisdiction in the present case is Alleghany's status as "a person which is not a carrier and which has control of one or more carriers," seeking permission "to acquire control of another carrier through ownership of its stock or otherwise . . . ." The failure to join two stockholders alleged to control Alleghany does not oust the Commission of jurisdiction. Since that is so, the status order submitting Alleghany to the Commission's jurisdiction cannot be attacked on that basis.

Appellees further argue, and the District Court held, 134 F. Supp., at 147–149 and 138 F. Supp., at 136–137, that under §§ 5 (2)(b) and 17 (3), appellees were entitled to an evidentiary hearing of some sort in the merger-status order proceeding (as distinguished from the subsequent preferred stock proceeding) even though the Commission had discretion to dispense with a "public hearing." Section 5 (2)(b), in its relevant portion, provides:

> "Whenever a transaction is proposed under subparagraph (a) . . . the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed

transaction is situated, and also such carriers and the applicant or applicants . . . and shall afford reasonable opportunity for interested parties to be heard. . . . a public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. . . ." 54 Stat. 906, as amended, 63 Stat. 485–486, 49 U. S. C. § 5 (2)(b).

Section 17 (3) provides, in part, that "All hearings before the Commission, a division, individual Commissioner, or board shall be public upon the request of any party interested." 54 Stat. 914, 49 U. S. C. § 17 (3).

We need not determine the bounds of the Commission's power to dispense with, or limit, hearings under § 5 (2)(b), for appellees' claim of a right to a hearing in the merger-status order proceeding must fail for another reason—lack of the requisite interest of "interested parties."

The reference in § 5 to "interested parties," like the reference in § 1 (20) to "party in interest," must be interpreted in accordance with the rules relevant to standing to become parties in proceedings under the Interstate Commerce Act. A hearing under that Act is not like a legislative hearing and "interest" is not equivalent to "concern." It may not always be easy to apply in particular cases the usual formulation of the general principle governing such standing—e. g., "the complaint must show that plaintiff has, or represents others having, a legal right or interest that will be injuriously affected by the order." *Moffat Tunnel League* v. *United States,* 289 U. S. 113, 119. In each case, the sufficiency of the "interest" in these situations must be determined with reference to the particular context in which the party seeks to assert its position.

Appellees assert three grounds of interest in the merger-status order proceeding: that they were common stock-

holders of Alleghany, that the assertion of jurisdiction by the Interstate Commerce Commission would deprive them of the benefits of the Investment Company Act, 54 Stat. 789, 15 U. S. C. § 80a–1 *et seq.,* and that the proposed preferred stock issue was unfair.

The fact that appellees were common stockholders of Alleghany is insufficient "interest." The proceeding before the Commission was to determine whether the Jeffersonville-Big Four merger was a transaction requiring Commission approval as an acquisition of control by "a person which is not a carrier and which has control of one or more carriers" of "another carrier through ownership of its stock or otherwise . . . ." 54 Stat. 905, 49 U. S. C. § 5 (2)(a)(i). Unlike the subsequent preferred stock order whose threatened financial injury to appellees was sufficient to confer standing to bring the present proceedings, the merger agreement had no special effect on appellees or on common stockholders of Alleghany. See *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 19–20. Nor did the proposed status order that Alleghany should be "considered as a carrier" and therefore regulated by the Interstate Commerce Commission by itself pose any individualized threat to the welfare of the appellees.

Reliance on the alleged benefits of protection under the Investment Company Act subtly begs the question. Alleghany would be subject to regulation under the Investment Company Act only if the Interstate Commerce Commission lacked jurisdiction to regulate it under § 5 of the Interstate Commerce Act. The fact that there may be another Act that gives appellees greater protection as investors is immaterial to the appellees' right to a hearing in the merger-status order proceeding. The question here is whether the proposed transaction falls within the Interstate Commerce Commission's jurisdiction, not what the consequences will be if it does not. No special threat

to appellees arises from the mere assertion of Commission jurisdiction to regulate Alleghany. When subsequent Commission action in approving the Alleghany's new preferred stock issue did present a special threat to appellees, that provided the "interest" sufficient to attack the Commission's jurisdiction in the present proceeding. But this threat could not retroactively confer upon them the right to a hearing in the merger-status order proceeding, in which they had no "interest."

Appellees' claim that they were entitled to a hearing in the preferred stock proceeding is governed by § 20a (6) of the Act, which provides that "The Commission may hold hearings, if it sees fit, to enable it to determine its decision upon the application for authority." 41 Stat. 495, 49 U. S. C. § 20a (6).

For all these reasons, the judgment of the District Court must be reversed and the case remanded for consideration by the District Court of appellees' claim, not previously discussed, that the preferred stock issue as approved by the Commission was in violation of the Interstate Commerce Act. This disposition renders it needless to pass on appellees' motion to dismiss in No. 82.

*Reversed and remanded.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

Alleghany Corporation, though not a carrier as that term is used in the Interstate Commerce Act, is subject to supervision by the Interstate Commerce Commission, 49 U. S. C. § 5 (3), and exempt from the control of the Securities and Exchange Commission under the Investment Company Act of 1940, 15 U. S. C. § 80a–3 (c) (9), if

it has the approval of the Interstate Commerce Commission to "acquire control of two or more carriers through ownership of their stock or otherwise." 49 U. S. C. § 5 (2)(a)(i).

"Control" as used in § 5 is defined in § 1 (3)(b):

> ". . . to include actual as well as legal control, whether maintained or exercised through or by reason of the method of or circumstances surrounding organization or operation, through or by common directors, officers, or stockholders, a voting trust or trusts, a holding or investment company or companies, or through or by any other direct or indirect means; and to include the power to exercise control."

"Control" thus means "actual" as well as "legal" control and includes the exercise of "indirect" as well as "direct" means. It seems obvious, therefore—so obvious as to be beyond the realm of dispute or argument—that if one has "actual" control through "indirect" means and changes the means whereby he commands that power, he has only retained "control," not acquired it within the meaning of § 5 (3). For one who has "control," as defined, does not acquire it when he merely changes the method or means of its exercise. Yet it is clear that Alleghany did no more than that.

Alleghany has control of the New York Central.

Most of the stock of the Big Four (Cleveland, Cincinnati, Chicago, & St. Louis R. Co.) is owned by Central. The lines of the Big Four are operated by Central as lessee.

There is a Bridge Company (the Louisville & Jeffersonville Bridge & R. Co.) whose stock, prior to the transaction about to be discussed, was owned by the Big Four and held by Central under the lease.

Alleghany, Central, the Big Four, and the Bridge Company applied to the Interstate Commerce Commission for

permission to merge the Bridge Company into the Big Four and for Central thereafter to operate the properties of the Bridge Company under the Big Four lease. The merger was an intra-system rearrangement of properties that did not affect one whit Alleghany's "control" in the statutory sense of the Bridge Company. Before the merger Alleghany had "control" of the Bridge Company. It therefore did not "acquire control" but only *retained* it as a result of the merger.

There was another transaction which Alleghany says caused it to "acquire control" of a carrier within the meaning of § 5 (3) and therefore to have a carrier status under the Interstate Commerce Act. Alleghany and Central applied to the Commission for permission to acquire the stock of Boston & Albany R. Co., Pittsfield & North Adams R. Corp., and Ware River R. Co. Central was operating the properties of those three roads under leases—two of the leases being for 99 years each and one for 999 years. The Commission approved this stock acquisition by Central.

There are two reasons why this transaction did not give Alleghany a carrier status. In the first place, § 5 (3) gives a noncarrier the status of a carrier only "to the extent provided by the Commission in such order." The Commission made no such order in connection with the acquisition of the stock of the three New England carriers.

In the second place Alleghany, through Central, had "actual control" of those three carriers prior to the acquisition of their stock. That "control" was evident by the long-term leases over the properties of those carriers. Alleghany, therefore, did not "acquire control" when Central acquired the stock of the three companies. The form of Alleghany's control changed by the stock acquisition. But the financial master of the three New England carriers was the same before Central acquired

their stock, as it was afterwards. As stated by the District Court, where a noncarrier is "already in indirect control of a carrier" and the transaction relied upon "still leaves the non-carrier in indirect control of such property, no acquisition by the non-carrier results from the merger." 138 F. Supp. 123, 127–128.

The court that made that ruling had as one of its members the late Judge Frank, who had no superior when it came to an understanding of the ways of high finance and to an analysis of regulatory measures dealing with it. I see no answer to what Judge Frank and his colleagues concluded on this phase of the case.

That view of § 5 (2) is plainly reflected in the legislative history. This control over noncarriers who acquired control of carriers was introduced in 1933. Commissioner Eastman pointed out to Congress the evil which was to be remedied—"holding companies have been bringing carriers under common control and hence combining them without any supervision or approval by the commission." [1] The Senate Report stated that the amendment gave the Commission control over holding companies that "effect consolidations without approval of the commission." [2] To "acquire control" within the meaning of § 5 (2) means then to put under common control carriers that previously were separate. We would strain to find a construction which would enable holding companies to run for shelter under the Act merely because, within the system they control, there have been corporate rearrangements or readjustments that change the internal structure of the system.

Alleghany points with alarm to the loopholes in the law that will be created if it is held that Alleghany did not "acquire" control in connection with the Bridge

[1] Hearings, House Committee on Interstate and Foreign Commerce on H. R. 9059, 72d Cong., 1st Sess., p. 250.

[2] S. Rep. No. 87, 73d Cong., 1st Sess., p. 1.

Company merger and the acquisition of the stock of the New England carriers. No loopholes will be created. Central could do neither of those two things without the approval of the Commission, since § 5 (2)(a) requires Commission approval of many intra-system transactions *by carriers.* That is the force of the holding in *New York Central Securities Corp.* v. *United States,* 287 U. S. 12. The loophole that is created comes from granting Alleghany a carrier status. Then Alleghany escapes the far more rigorous supervision which is imposed on it by the Investment Company Act.

The only other means by which Alleghany could have acquired a carrier status was in connection with financial transactions long since liquidated. Alleghany had a carrier status, granted it by the Interstate Commerce Commission, when it acquired the stock of the Chesapeake & Ohio R. Co. and two other carriers. That order, issued in 1945, gave it a carrier status "unless and until otherwise ordered" by the Commission. That order was terminated by the Commission on May 24, 1955.

The approval of the preferred stock issue that is involved in this litigation did not come until later, *viz.* June 22, 1955. At that time it seems plain that Alleghany had no carrier status and could not obtain one on the basis of the intercorporate transactions on which it relies.

I would affirm the judgment below.