AMERICAN TRAIN DISPATCHERS ASSOCIATION, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Soo Line Railroad Company, et al., Intervenor.

AMERICAN TRAIN DISPATCHERS ASSOCIATION, Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,

Union Pacific Railroad Company, et al., Intervenor.

Nos. 80–1376, 80–2508.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 23, 1981.

Decided Feb. 16, 1982.

Timm L. Abendroth, Atty., I. C. C., of the bar of the Supreme Court of Wisconsin, Washington, D.C., pro hac vice by special leave of the Court with whom Richard A. Allen, Gen. Counsel, I. C. C., Henry F. Rush, Associate Gen. Counsel, I. C. C., John J. Powers, III and Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents.

Byron D. Olsen with whom Christopher A. Mills was on the brief for intervenors, Soo Line Railroad Company et al. in 80–1376.

Mark A. Kalafut and W. Donald Boe, Jr., were on the brief for intervenors, Union Pacific Railroad Co. et al. in 80–2508.

Before WRIGHT, MacKINNON and ROBB, Circuit Judges.

Opinion PER CURIAM.

Opinion concurring in part and dissenting in part filed by Circuit Judge J. SKELLY WRIGHT.

PER CURIAM:

Petitioner American Train Dispatcher Association seeks to set aside two decisions of the ICC in which the Commission found that two modifications designating different parties to assume existing functions under long existing joint trackage agreements between railroads do not require Commission approval under 49 U.S.C. § 11343, formerly § 5(2) of the Interstate Commerce Act. We affirm the ruling by the Commission.

I

In the "Soo" case, *American Train Dispatchers Association v. Chicago & N.W.*, 360 I.C.C. 457 (1979), the Commission held that the transfer of train dispatching responsibility over joint trackage from one participating carrier to another, both of whom were long-time parties to the joint trackage agreement at issue, is not a transaction requiring Commission approval under 49 U.S.C. § 11343. Similarly, in the "Milwaukee" case, *American Train Dispatchers Association v. Union Pacific R. R.*, (decision served November 10, 1980), the Commission held that the transfer of supervisory, operational, and maintenance functions over a

Gordon P. MacDougall, Washington, D.C., for petitioner.

jointly-owned track from one railroad to another does not require Commission approval under the same statute (*id.*).

■ The applicable provisions of the relevant statute provide:

(a) The following transactions involving carriers providing transportation subject to the jurisdiction of the ICC . . . may be carried out only with the approval and authorization of the Commission: . . .

(2) a purchase, lease, or contract to operate property of another carrier by any number of carriers; . . . (6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.

49 U.S.C. § 11343. It is apparent from the above provisions that it was the intent of Congress that transactions between carriers for the acquisition of significant (primarily financial or management) operational control over another carrier should not be made without the prior authorization and approval of the ICC. This interpretation is supported by *Allegheny Corporation v. Breswick & Co.*, 353 U.S. 151, 161, 77 S.Ct. 763, 769, 1 L.Ed.2d 726 (1957) interpreting § 5(2) of the ICC Act which, so far as here material, was reenacted as § 11343(a)(2) and (6) of the present law. In *Breswick* the Court remarked:

The crux of each inquiry to determine whether there has been an "acquisition of control" is the nature of the change in relations between the companies whose proposed transaction is before the Commission. Does the transaction accomplish a *significant* increase in the power of one over the other, for example, an increased voice in management or operation, or the ability to accomplish financial transactions or operational changes with greater legal ease? (emphasis supplied)

353 U.S. at 169, 77 S.Ct. at 773. In both the *Soo* and *Milwaukee* cases, the existing oper-

ating agreements, prior to amendment, stipulated (by trackage rights or joint trackage agreements, respectively) that both parties to each agreement could use the same railroad tracks. None of the carriers, that is, had exclusive right of usage over any of the lines in question.

In addition, the *Soo* agreement in 1963 stipulated that no changes or modifications in the terms and conditions of that agreement could ensue without prior ICC approval.[1] Subsequently, when a material shift developed in the amount of rail traffic carried by the respective railroads who were parties to the joint trackage agreements, the railroads designated one of the other signatory carriers (the Soo and Milwaukee) to carry on the dispatching and maintenance functions. This also resulted in the shift of employees who had been performing the designated function from one railroad to the other.

## II

■ Neither modification involved any transfer or acquisition of trackage rights, joint ownership, or joint use of a railroad line between the party carriers and, since the railroad assuming the dispatching function did not acquire any additional operating rights over the property covered by the joint trackage agreements, neither modification constituted the acquisition or control of property of another carrier under *Breswick*. The same personnel carried on the same function over the same track with no change in operating rights of any character. As the Board found:

While it is true that the dispatching of trains over joint trackage does involve some "control" of the property of other carriers, this "control" only extends to the order in which trains move over the joint trackage and is primarily a safety function. Such "control" of the movement of equipment is not the type of control as is contemplated by 49 U.S.C. § 11343(2).

---

1. The ICC order approving the agreements provided:

That no changes or modifications in the terms and conditions of said agreements . . .

shall be effected without prior approval of the Commission.
(J.A. 104).

(J.A. (S) L15). Thus, neither of these modifications in the agreements amounted to a transfer of *significant* control (financial, management or otherwise) over the property in question. Consequently, neither modification required ICC approval under § 11343(a)(2) or (6) within the intent of Congress as interpreted by the Supreme Court in *Allegheny Corporation v. Breswick & Co., supra.*[2]

In the case of the *Soo* agreement, moreover, the triviality of the change clearly exceeded the modifications that the parties to the 1963 agreement contemplated would require Commission approval. The ICC has already come to this conclusion earlier in these proceedings. On November 7, 1979, Division 1 of the ICC reviewed petitioner's claims here at issue and held that the modifications of the *Soo* agreement here under scrutiny were "ministerial," not "material," and therefore did not require approval by the ICC under the 1963 agreement:

> [W]hether formal approval of the Commission ... [pursuant to the 1963 agreement] ... would actually be required to effect such changes in the terms would depend on whether such changes may have *material impacts on carrier operations and services* subject to the Interstate Commerce Act. ...
>
> Here the only modification to the previously authorized agreement is the carrier nominally designated to discharge the ministerial function of train dispatching. This function is inherent to any joint trackage operation. It will be continued to be carried out, as it has been carried out in the past, pursuant to continuance

of joint trackage operations. Clearly such change should have no effect on carrier operations and services or on the relationships between the parties otherwise prescribed under 49 U.S.C. § 11343. Accordingly this change does not require our approval.

(J.A. 158–59). (Emphasis added).

Following this decision by Division I, petitioner filed for further review by the full Commission on this and other points. On January 15, 1980, the ICC affirmed the interpretation of Division 1 *in toto.*

In so affirming, the ICC interpreted its prior order concerning the 1963 agreement as not requiring ICC approval of insubstantial modifications such as those here under consideration. Because the ICC's construction of its own order is entitled to great weight, and because it is peculiarly qualified to interpret the effect of the modifications here in issue, we decline petitioner's invitation to countermand the Commission's interpretation. Any other decision at this point would unnecessarily embroil the ICC against its will in scrutiny of matters of the most incidental character.

### III

█ With further respect to compliance with the 1963 agreement the ICC acknowledged that it was sufficient for the parties in the *Soo* case to merely *record* the modification by filing with the Commission, which they had done. Petitioner contends that there is no statutory authority for this "recording" procedure, alleging that the ICC

---

**2.** That previously existing section 5(2)(a) of the ICC Act was intended to apply to major transactions involving changes in the control or management of railroads and significant portions thereof as indicated by section 5(2)(b). Subsection (b) required the Commission to notify the Governor of every state in which any part of any railroads involved in any subsection (a) transaction was located and provided for hearings for interested parties in the transaction. In the 1978 general revision of the Interstate Commerce Act (92 Stat. 1337, *et seq.*) the provisions of 5(2)(b) for notification and hearing were slightly modified and set forth in § 11334 (92 Stat. 1436). However, there was no essential change with respect to the character of

the *transactions* involving carriers that continued to be subject to the approval and authorization of the Commission. *See* 49 U.S.C. § 11343(a). Subsections (2) and (6) § 11343(a) carried forward *in haec verba* the similar provisions of § 5(2)(a). Thus the *Breswick* interpretation that the section applies to "*significant* increase[s] in the power of one [railroad] over another, where there is an '*increased* voice in management or operation, or [in] the ability to accomplish financial transactions or operational changes with greater legal ease'," continues to apply to transactions under § 11343(a)(2) & (6). None of these elements were present in the instant modifications.

fabricated the recording requirement to suit their needs because of a desire to refrain from ruling that approval of the amendments was required by statute.[3] It is clear that the statute does not strictly require *approval or recording* of such amendments. Recording the modification by filing with the Commission, however, served to bring the minor change to the attention of the Commission and when the Commission took no action thereon (and have not to this date), waiver of any requirement for more formal approval can be presumed. The contrary argument is faulted as being overly literal and as ignoring the reasonable intent of the parties and the Commission in a matter that is not required by statute. Petitioner's argument here is therefore irrelevant and there is no need to address the "recordation" issue further.

## IV

■ It is next argued by petitioner that the amendments adversely affect employees of the transferor lines. This issue is plainly irrelevant as well to the consideration of any obligation the Commission has to approve the amendments. *All* that is present-

ly at issue is whether under the *statute* the ICC must pass upon the amended agreements. In *Railway Labor Executives' Association v. United States*, 151 F.Supp. 108, 114 (D.D.C.1957), the D.C. District Court held that the existence of employee injury cannot be a test for determining whether an agreement falls within the scope of § 5(2), (presently § 11343):

> The test of a transaction under § 5(2) is not, as plaintiff contends, whether it has an adverse effect on railroad employees, but whether it involves a *consolidation or acquisition of control or management over two or more railroads in a common interest.*

151 F.Supp. at 114. (emphasis added). This analysis is still eminently sound under § 11343.

## V

■ Finally, petitioners contend that the ICC is required to protect the affected employees in the instant cases in accordance with the provisions of 49 U.S.C. § 11347.[4] This argument misses the point of that section altogether. Section 11347 provides that *if* the ICC finds that § 11343 applies to

---

**3.** It is true that there is no statutory authority for the recording procedure, but neither does the statute require approval of the modification, as was decided in *Breswick, supra.* Thus, any approval that might be required by the joint trackage *agreement* would not necessarily require approval in accordance with the same notice and hearing procedures incident to a statutory approval under the then existing statute, i.e., § 5(2), *supra.* Thus, petitioner's claim that the Commission ruled out the necessity under the *agreement* of formally approving the shift in dispatching duties in order to escape approval under the *statute* is a *non sequitur.* The form of approval that might be required by the statute and by the provision of the 1963 agreement did not necessarily involve the same procedures. And, even if some Commission approval were held to be required the current shift in dispatching duties under the agreement would not be equivalent to a statutory change, or require procedures equivalent to those under the present statute or § 5(2).

**4.** 49 U.S.C. § 11347 provides:
§ 11347. Employee protective arrangements in transactions involving rail carriers

When a rail carrier is involved in a transaction for which approval is sought under sections 11344 [*] and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period). Pub.L. 95–473, Oct. 17, 1978, 92 Stat. 1439.
* Section 11344 refers to applications under section 11343.

a given agreement, then (and *only* then) is the obligation imposed on the ICC. Since § 11343 does not apply in the instant cases, the requirements of § 11347 are not applicable.

For reasons above stated the decision of the Interstate Commerce Commission is affirmed.

*Judgment accordingly.*

J. SKELLY WRIGHT, Circuit Judge, concurring in No. 80–2508 and dissenting in No. 80–1376:

In *American Train Dispatchers Ass'n v. Chicago & N. W. Transportation Co.*, 360 ICC 457 (1979) (*reproduced in* Joint Appendix (JA) (S) at 145) (the "Soo" case), the Interstate Commerce Commission held that transfer of train dispatching responsibility over joint trackage from one carrier to another did not require Commission approval under the terms of a 1963 ICC order. In No. 80–1376, the majority affirms this finding. I dissent.*

Control of the dispatching of equipment over the joint trackage was specified in great detail in joint trackage agreements approved by ICC order in 1963. *See* JA (S) at 165. The 1963 order states:

> *It is further ordered*, That no changes or modifications in the terms and conditions of said agreements * * * shall be effected without prior approval of the Commission * * *.

JA (S) at 167 (italics in original).

In the Soo case the defendant railroads implemented changes and modifications in the 1963 agreements *without* prior Commission approval. These actions clearly violated the terms of the 1963 ICC order, as the Commission's own Review Board concluded. JA (S) at 115. The Commission itself admits that it did not approve the changes in

the joint trackage agreement. However, in reversing the Review Board the Commission held that it was sufficient for the defendants in the Soo case merely to *record* the changes in the prior agreements with the ICC. 360 ICC at 462 (JA (S) at 150). There is no basis in the 1963 order for this recordation requirement; that order mandated "prior approval."

I agree with the decision of the ICC's Review Board. Confusion abounds when the Commission refuses to follow the plain language of its own orders.

I therefore respectfully dissent in No. 80–1376.

* I agree with the majority that the transactions involved in these appeals do not require the Commission's approval under 49 U.S.C. § 11343 (1976). I therefore concur in the majority's affirmance in No. 80–2508 of *American*

*Train Dispatchers Ass'n v. Union Pacific R. Co.* (decision served Nov. 10, 1980) (the "Milwaukee" case), which involved only the statutory issue.