TRANS WORLD AIRLINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Hughes Tool Company, Intervenor.

No. 138, Docket 29063.

United States Court of Appeals Second Circuit.

Argued Sept. 25, 1964.

Decided Dec. 7, 1964.

John F. Sonnett, New York City (Cahill, Gordon, Reindel & Ohl, and Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief, Paul W. Williams, Carl S. Rowe, Dudley B. Tenney, Marshall H. Cox, Jr., and Abraham P. Ordover, New York City, of counsel), for petitioner.

O. D. Ozment, Associate Gen. Counsel, C. A. B., Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Lionel Kestenbaum, Atty. Dept. of Justice, John H. Wanner, Gen. Counsel, Joseph B. Goldman, Deputy Gen. Counsel, Stuart M. Levine, and Lynn B. Clausen, Attys., C. A. B., of counsel), for respondent.

Chester C. Davis, New York City, for intervenor.

Before LUMBARD, Chief Judge, and SMITH and HAYS, Circuit Judges.

HAYS, Circuit Judge.

Petitioner, Trans World Airlines, Inc., seeks review in this court under Section 1006 of the Federal Aviation Act [1] of an order of the respondent Civil Aeronautics Board.[2] The Board's order resulted from

1. 72 Stat. 795 (1958), as amended, 74 Stat. 255 (1960), 75 Stat. 497 (1961), 49 U.S.C. § 1486 (1958 & Supp. V, 1964).

2. No. E–21057, dated July 10, 1964.

58

a motion by Hughes Tool Company requesting either a disclaimer of jurisdiction or approval under Section 408 of the Act [3] as to the acquisition by Toolco of

3. 72 Stat. 767 (1958), as amended, 74 Stat. 901 (1960), 49 U.S.C. § 1378 (1958 & Supp. V, 1964).

The parts of Section 408 which are relevant for this litigation read as follows:

"Consolidation, merger, and acquisition of control—Prohibited acts

"(a) It shall be unlawful unless approved by order of the Board as provided in this section—

"(1) For two or more air carriers, or for any air carrier and any other common carrier or any person engaged in any other phase of aeronautics, to consolidate or merge their properties, or any part thereof, into one person for the ownership, management, or operation of the properties theretofore in separate ownerships;

"(2) For any air carrier, any person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to purchase, lease, or contract to operate the properties, or any substantial part thereof, of any air carrier;

"(3) For any air carrier or person controlling an air carrier to purchase, lease, or contract to operate the properties, or any substantial part thereof, of any person engaged in any phase of aeronautics otherwise than as an air carrier;

"(4) For any foreign air carrier or person controlling a foreign air carrier to acquire control, in any manner whatsoever, of any citizen of the United States engaged in any phase of aeronautics;

"(5) For any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever;

"(6) For any air carrier or person controlling an air carrier to acquire control, in any manner whatsoever, of any person engaged in any phase of aeronautics otherwise than as an air carrier; or

"(7) For any person to continue to maintain any relationship established in violation of any of the foregoing subdivisions of this subsection.

Application to Board; hearing; approval; disposal without hearing

"(b) Any person seeking approval of a consolidation, merger, purchase, lease, operating contract, or acquisition of control, specified in subsection (a) of this section, shall present an application to the Board, and thereupon the Board shall notify the persons involved in the consolidation, merger, purchase, lease, operating contract, or acquisition of control, and other persons known to have a substantial interest in the proceeding, of the time and place of a public hearing. Unless, after such hearing, the Board finds that the consolidation, merger, purchase, lease, operating contract, or acquisition of control will not be consistent with the public interest or that the conditions of this section will not be fulfilled, it shall by order approve such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe: *Provided,* That the Board shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control: *Provided further,* That if the applicant is a carrier other than an air carrier, or a person controlled by a carrier other than an air carrier or affiliated therewith within the meaning of section 5(8) of the Interstate Commerce Act, as amended, such applicant shall for the purposes of this section be considered an air carrier and the Board shall not enter such an order of approval unless it finds that the transaction proposed will promote the public interest by enabling such carrier other than an air carrier to use aircraft to public advantage in its operation and will not restrain competition: *Provided further,* That, in any case in which the Board determines that the transaction which is the subject of the application does not affect the control of an air carrier directly engaged in the operation of aircraft in air transportation, does not result in creating a monopoly, and does not tend to restrain competition, and determines that no person disclosing a substantial interest then currently is requesting a hearing, the Board, after publication in the Federal Register of notice of the Board's intention to dispose of such application without a hearing (a copy of which notice shall be furnished by the Board to the Attorney General not later than the day following the date of such publication), may determine that

Sinking Fund Notes of TWA in the principal amount of $92,800,000 from the Metropolitan Life Insurance Co. and The Equitable Life Assurance Society of the United States. TWA intervened before the Board opposing the relief requested by Toolco on various grounds. The Board's order, which was issued without holding a hearing, "declared" that Toolco was free to acquire the TWA notes on condition that Toolco divest itself of control over Northeast Airlines, Inc. TWA requests that this court vacate and set aside the order, direct the Board "to take no further action" on Toolco's motion "until after determination of the related issues between TWA and Toolco now sub judice," and to afford a hearing at that time to TWA and others on the Toolco motion. Respondent CAB requests that its order be affirmed or the petition for review dismissed and Toolco, which has obtained leave to intervene, requests similar relief.

## I. THE FACTUAL BACKGROUND

### A. *Previous Orders of the Board*

Beginning about 1939 Howard Hughes bought TWA common stock through Toolco, his wholly owned and controlled corporation, until by 1942 Toolco owned 440,050 shares, 45.6 percent of the total outstanding shares. On application of Toolco in 1944 the CAB held a Section 408 hearing and determined that Toolco had acquired control of TWA through its 45.6 percent ownership interest.[4] CAB approved this "acquisition of control" because it believed Toolco's operations and plans would not be adverse to the public interest "in view of what might be referred to as the paternalistic attitude which Hughes Tool has exhibited up to the present time."[5] To guard against the possibilities of abuse of Toolco's control of TWA by reason of Toolco's aircraft activities, the CAB imposed conditions on its approval, requiring TWA and Toolco to limit individual transactions between them to items less than $200 in value and total annual transactions between them to $10,000.[6]

In 1947 the Board ordered an investigation to determine whether any "agreement or any arrangement or action related thereto, or any change in the activities of Toolco in the field of areonautics since [the 1944 order] * * * has resulted or will result in an acquisition of control of TWA" requiring approval under Section 408, and "whether such acquisition of control, if any, is consistent with the public interest and fulfills the conditions of said section 408 * * * * "[7] The Board found after investigation and hearing that there was an agreement between Toolco and TWA which gave Toolco the "right to acquire up to a possible 80 percent of the stock in TWA."[8] The Board held "that there can be more than one acquisition of control of an air carrier, as a matter of law * * * *,"[9] and "that the term 'control' is not an absolute or unqualified concept, but rather one which may import various meanings and apply to and cover a variety of situations."[10]

The Board determined on these principles that Section 408 approval was required despite prior approval in 1944 because "a controlling person owning a substantial portion of the controlled carrier's stock may have acquired [in 1944] an actual or *de facto* control but not the full and complete legal control which flows from ownership of all, or substantially all, of the issued and outstanding stock of the carrier."[11] The Board ordered a Section 408 hearing to approve

---

the public interest does not require a hearing and by order approve or disapprove such transaction."

4. Opinion and Order No. 3210, 6 C.A.B. 153, 154–56 (1944).

5. Id. at 156.

6. Id. at 157–58.

7. Opinion and Order No. E–1735, 9 C.A.B. 381 (1948).

8. Id. at 385.

9. Ibid.

10. Id. at 386.

11. Id. at 387.

or disapprove the "further acquisition of control." [12]

After a hearing the Hearing Examiner found the "further acquisition of control" of TWA by Toolco to require "a rather broad inquiry into the relationships between the controlling and the controlled companies," [13] and therefore he extensively reviewed the activities of TWA, Toolco, and Hughes since 1944. He found "no conflict of interest between Toolco's present or contemplated aeronautical activities and its control of an air carrier." [14] He held that Toolco and Hughes had contributed "to the welfare and well-being of TWA" by their "efforts at maintaining or improving the carrier's financial position following the war," [15] and "that the additional control acquired by Toolco * * * is consistent with the public interest." [16] The CAB adopted the findings and conclusions of the Examiner and approved the acquisition of further control subject to the same conditions imposed in 1944.[17]

In 1960 TWA requested Board approval of a plan for financing the purchase of jet aircraft. The plan provided for the issuance to Metropolitan Life Insurance Co. and Equitable Life Assurance Society of $92,800,000 principal amount of 6½% Equipment Mortgage Sinking Fund Notes of TWA, due December 31, 1972. The TWA stock held by Toolco was placed in a voting trust which was to last until December 15, 1970, unless first terminated or extended as provided in the agreement.

Toolco appointed one of three trustees. The other two, however, were appointed by the notes agent, the Irving Trust Co., and the voting rights in Toolco's TWA stock were to be exercised by majority vote of the three trustees. Under the Option Agreement Toolco had the non-transferable right to purchase outstanding TWA Sinking Fund Notes by payment of the notes in full plus a premium of twenty-two percent until March 31, 1962, when the amount of premium was to be thereafter reduced by one-half percent for each elapsed quarter year.[18] On exercising this option Toolco could terminate the voting trust.

Under the Option Agreement Toolco was required to provide satisfactory opinion of counsel stating that all necessary governmental approval had been obtained before it could purchase the notes from the insurance companies and terminate the voting trust.[19]

The Board considered that under this plan "a significant and fundamental change will have been accomplished in the control of TWA by Toolco." The Board stated: "Upon the execution of the voting Trust, the Toolco control of TWA will change drastically in both form and substance." [20]

Believing that "to facilitate TWA's acquisition of jet equipment is in the public interest" and that doubts about the "jurisdiction" of the Board to act should be set aside when its competence to act under Section 408(a) was uncontested, the Board approved the plan, but also stated it anticipated a Section 408(b) application and hearing "before Toolco would attempt to reassume control over TWA." [21]

## B.  The Antitrust Action

In 1961 TWA brought a civil antitrust suit against Toolco, Howard Hughes, and Raymond M. Holliday, a Toolco executive and TWA trustee, in the District Court for the Southern District of New York, seeking some $45,000,000 in damages before statutory trebling, and equitable relief, including Toolco's divestiture

12. Id. at 391–92.

13. Report of Examiner Edward T. Stodola, 12 C.A.B. 192, 196 (1950).

14. Id. at 216.

15. Id. at 217.

16. Id. at 224.

17. Opinion and Order No. E–4701, 12 C.A.B. 192–93 (1950).

18. Order No. E–16195, 32 C.A.B. 1363–64 (1960).

19. Id. at 1365 n. 19.

20. Id. at 1364.

21. Id. at 1365.

of TWA stock. TWA also filed an action in the Chancery Court of Delaware against Toolco and Hughes alleging that they had violated their fiduciary duty to TWA, and seeking similar relief. Because of Hughes's failure to depose, default judgment was entered in TWA's favor in the federal court action.[22] On appeal this court affirmed the decision of the district court. The Supreme Court has granted certiorari in this case.[23]

C. *The Order Under Attack*

On April 29, 1964, Toolco filed with the CAB the motion that led to the order now under attack. Toolco stated that it desired "to be in a position to exercise its rights under the aforesaid Option Agreement and if need be thereby to terminate the Voting Trust." Toolco requested that the CAB "either disclaim jurisdiction over the acquisition by Toolco from Metropolitan and Equitable of the $92,800,000 principal amount of Series A Sinking Fund Notes of TWA now outstanding, all in accordance with the aforesaid Option Agreement, or that the Board modify its prior order under Section 408 of the Act or enter an order under Section 408 of the Act granting such authorization or approval as may be necessary to permit such acquisition."

Since this transaction would bring it again under the direct supervision of Toolco and Hughes without the intervention of the two independently controlled voting trustees, and because it believed that its pending antitrust claims against Toolco, Hughes, and Holliday would be endangered, TWA opposed Toolco's motion. It requested that the motion be denied or stricken on the grounds that Toolco's threatened reassumption of control of TWA was made to circumvent Toolco's antitrust liability and would thus be adverse to the public interest, that the motion in any case required approval as an "acquisition of control" under Section 408(a) (5), and that a full evidentiary hearing was required under Section 408(b) when and if Toolco made a proper application.

The Board issued its order solely on the arguments presented by Toolco and TWA and without any hearing. It held that Toolco's motion did not require a hearing and that "the basic legal question presented is whether or not Board approval is required as a condition to this resumption of control." The Board denied Toolco's motion on the ground that Toolco also controlled Northeast Airlines, and the common control of Northeast and TWA would present a § 408 issue never before decided by the Board. Although the Board had previously approved Toolco's control of Northeast,[24] the fact that Toolco's TWA stock was then in a voting trust had made it unnecessary to consider the question of common control at that time.

The Board went on, however, to state:

"The question remains whether, in the absence of common control, the resumption of full managerial control by Toolco of TWA, following the termination of the voting trust, would in itself require Board approval after hearing under section 408 as an acquisition of control of a carrier by a person engaged in a phase of aeronautics. Since this question has been thoroughly briefed, and in view of the importance of terminating the controversy between the parties on this subject and removing uncertainty as to the application of section 408 to the peculiar facts involved, we find it appropriate to issue a declaratory ruling on the question." (Footnote omitted.)

22. Trans World Airlines, Inc. v. Hughes, 32 F.R.D. 604 (S.D.N.Y.1963) (Metzner, D.J.).

23. Trans World Airlines, Inc. v. Hughes, 332 F.2d 602 (2d Cir. 1964) (Lumbard, Ch.J.), cert. granted Hughes Tool Co. v. Trans World Airlines, 85 S.Ct. 261, 265 (Nov. 16, 1964).

24. Toolco-Northeast Control Case, Order No. E–18470, dated June 19, 1962, aff'd sub nom. National Airlines, Inc. v. CAB, 116 U.S.App.D.C. 114, 321 F.2d 380 (1963).

The Board concluded that the prior orders of 1944 and 1950 authorizing "Toolco's ownership of 73 per cent of the stock of TWA" were not terminated by the Voting Trust Agreement. The Board said:

"In our view of the matter, we need not reach the issue as to whether the voting trust effected a complete insulation of Toolco's control over TWA within the meaning of section 408. Even if we assumed that Toolco temporarily lost all power to control TWA during the period of the voting trust, this fact would not have effected a termination of the Board's prior approval of the Toolco control of TWA under the unique circumstances present here. In our judgment there was involved at most a temporary hiatus in control imposed upon Toolco by the exigencies of TWA's financing requirements. Toolco at all times has retained the beneficial ownership of the stock in question. The trust itself is for a temporary period of ten years and is terminable prior to the end of that period upon the discharge of TWA's indebtedness to the financial institutions. We find nothing in either the literal language of section 408 or its underlying policy that would require that Toolco be subjected to a second hearing on the very issue which was previously heard and decided by the Board. A contrary reading of the statute would result in harassment of Toolco without vindicating any statutory objectives." (Footnote omitted.)

In a footnote the Board referred to the statement in its 1960 order that it anticipated a Section 408(b) application and hearing "before Toolco would attempt to reassume control over TWA." [25] The Board characterized this as "dictum" because the jurisdictional issue was not then before the Board and it did not have the benefit of "full briefing." "Accordingly, absent control of

another air carrier, and upon prior approval of the Board, Toolco would be free to resume full control of TWA without any further hearing." Paragraph 2 of the order of the Board provided:

"It is hereby declared that Toolco may exercise its option to acquire the TWA Notes described herein at such time as it submits a plan satisfactory to the Board which would effectively divest Toolco of the power to simultaneously control both TWA and Northeast."

## II. DISPOSITION OF THE BOARD'S ORDER

■ On the principal issue we hold that the Board should have held a hearing before issuing its order permitting Toolco to resume control of TWA and that the declaratory ruling was an abuse of the Board's discretionary power.

Section 408(b) requires a hearing to determine whether the acquisition of control of an airline is in the public interest. Among the criteria of the public interest which the Board must safeguard, according to section 102,[26] are the fostering of "sound economic conditions" in air transportation, and the promotion of service without "unfair or destructive competitive practices."

The Board, when it issued its order, must have been aware of TWA's claims as set forth in its pleadings in the antitrust action. The charges against Toolco included preventing TWA from competing with other carriers by keeping it from acquiring jet aircraft and by diverting to other carriers jet aircraft originally assigned to TWA, and preventing TWA from obtaining necessary financing at reasonable rates. In view of the default in the antitrust action the charges against Toolco stand undenied. They present a picture which is entirely inconsistent with the requirements of the public interest.

The conduct which is the subject of the antitrust action is alleged to have taken place during the years which intervened between the Board's order of 1950

25. See note 21 supra and accompanying text.

26. 72 Stat. 740 (1958), 49 U.S.C. § 1302 (1958).

and the voting trust arrangement of 1960. Yet the Board's order is based upon the investigation and findings preceding its previous orders of 1944 and 1950. A mere reading of the findings of the Board in connection with the previous orders, as we have set those findings forth above, indicates the great difference which exists between the present situation and the situation which obtained in the periods before the 1944 and 1950 orders were issued. In view of the notice which the Board had of changes in the situation during the period since 1950 it could not properly rely on its 1950 order in granting permission to Toolco to resume control of TWA.

Toolco contests the ripeness of the controversy for decision, TWA's standing, and statutory reviewability.[27] We hold this order, which was explicitly intended by the Board to terminate "the controversy between the parties on this subject," ripe for our consideration. The Board has made an authoritative pronouncement on which important transactions are likely to depend.[28] TWA has standing as "any person disclosing a substantial interest."[29] Its identity as the acquired airline satisfied the liberal standing requirement of Section 1006(a). See City of Houston v. CAB, 115 U.S.App.D.C. 94, 317 F.2d 158, 160 (1963); Seaboard & Western Airlines, Inc. v. CAB, 86 U.S.App.D.C. 64, 181 F.2d 515, 518 (1949), cert. denied, 339 U.S. 963, 70 S.Ct. 997, 94 L.Ed. 1372 (1950). Under this same statutory provision in the Civil Aeronautics Act of 1938 this court stated that a competitor of an airline which was granted a certificate of public convenience and necessity possessed a "substantial interest" "because it would be adversely affected by the diversion of traffic to a prospective competitor." Pan American Airways Co. v. CAB, 121 F.2d 810 (2d Cir. 1941) (dictum). In this case, TWA as the "victim" in this "acquisition of control" proceeding likewise possesses standing under Section 1006(a).

The reviewability of this "declaratory ruling" under Section 1006(a) depends ultimately on whether it is "an order that determines a 'right or obligation' so that 'legal consequences' will flow from it." Pennsylvania R. R. v. United States, 363 U.S. 202, 205, 80 S.Ct. 1131, 1133, 4 L.Ed.2d 1165 (1960). Here the Board expressly intended to determine Toolco's rights under prior orders and it is apparent that Toolco, the Board and TWA will suffer "legal consequences" by reason of that determination.[30] Orders declarative of a party's status under a federal regulatory statute are reviewable. See Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 159–161, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957); Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910 (1956); Rochester Tel. Corp. v. United States, 307 U.S. 125, 126–144, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); 1 Davis, Administrative Law § 4.10, at 270–71, 278 (1958).

Toolco claims that the venue of this petition is improper under Section 1006(b)[31] because "the principal place of business" of petitioner TWA is Kansas City. TWA asserts by affidavit that its principal place of business is New York, the situs of its executive headquarters. It is unnecessary to decide the issue of venue. Venue is a privilege personal to

---

27. See generally 3 Davis, Administrative Law §§ 21.01–23.20, especially § 21.07 (1958 & 1963 Pocket Part). See also Jaffe, Ripeness and Reviewable Orders in Administrative Law, 61 Mich.L.Rev. 1273 (1963).

28. Toolco's exercise of the Option Agreement depends on satisfactory opinion of counsel that all necessary governmental approval has been obtained. Note 19 supra and accompanying text.

29. Federal Aviation Act § 1006(a), note 1 supra.

30. Also significant is the effect that "declaratory ruling" would have in satisfying the requirement of the Option Agreement that all necessary governmental approval be obtained for Toolco to exercise its option. See notes 19, 28 supra.

31. Note 1 supra.

a defendant in a civil suit and a person intervening on either side of the controversy may not object to improper venue. 4 Moore, Federal Practice ¶ 24.19, at 147 (2d ed. 1963); see 2 Barron & Holtzoff, Federal Practice and Procedure § 593, at 359 (rev. ed. Wright 1961). Although normally an intervenor in a civil suit has a less substantial interest than Toolco has in this proceeding, Toolco had to seek the permission of this court to intervene. By doing so without simultaneously or soon thereafter raising a motion directed to venue, Toolco waived any defense of improper venue it may have possessed as an intervenor. 4 Moore, op. cit. supra, ¶ 24.19, at 147.

Paragraph 2 of the Board's order is set aside and the case is remanded to the Board for action not inconsistent with this decision.