**CURTIS T. BEDWELL AND SONS, INC., Appellants,**

v.

**INTERNATIONAL FIDELITY INSURANCE COMPANY, Appellees,**

v.

**MARKIM, INC., Hennelly, John J., Hennelly, Margaret, John J. Hennelly, Inc., and Zimmerman, Fred, Trustee for John J. Hennelly, Inc., Appellees,**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, Fidelity and Guaranty Insurance Underwriters, Inc., and Reinsurance Corporation of New York and Travelers Indemnity Co. and Fireman's Fund Insurance Co. and Employers Reinsurance Corporation and American Reinsurance Company and Aetna Casualty & Surety Co., Appellants.**

Nos. 86–1598, 86–1624 and 86–1630.

United States Court of Appeals,
Third Circuit.

Argued May 21, 1987.

Decided March 31, 1988.

As Amended July 1, 1988.

David A. Gradwohl (argued), Howard A. Rosenthal, Pelino & Lentz, P.C., Philadelphia, Pa., for appellants.

Arnold P. Borish (argued), Claire Rocco, John S. Summers, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, Pa., for appellee International Fidelity Ins. Co.

David L. Creskoff (argued), Robert T. Carlton, Jr., Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for appellee/cross appellant Fred Zimmerman, Trustee for John J. Hennelly, Inc.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Curtis T. Bedwell & Sons, Inc. ("Bedwell"), plaintiff and counterclaim defendant in a district court action arising out of a construction contract dispute, from the district court's Fed.R.Civ.P. 37(b) and (d) discovery sanctions orders which: (1) dismissed Bedwell's complaint; (2) decreed liability by default against it on a claim and counterclaim; and (3) awarded damages of $616,505 plus interest on the claim without a hearing on the damage amount. The prevailing parties in these claims were International Fidelity Insurance Company ("International"), the surety on the performance bond issued to cover John J. Hennelly, Inc. ("Hennelly"), Bedwell's masonry subcontractor, and Fred Zimmerman ("Trustee"), the trustee in bankruptcy for Hennelly in its subsequently filed bankruptcy proceeding. The principal issues before us are: (1) whether the district court, in dismissing the complaint, properly applied the governing *Poulis* factors [1] or abused its discretion; and (2)

whether the district court's refusal to hold an adversary hearing to determine damages was improper.

We are persuaded by the district court's numerous findings concerning Bedwell's discovery abuses, including the personal discovery misconduct of Bedwell's principal officers, Curtis and Thomas Bedwell, and by the district court's careful weighing of the *Poulis* factors, that it did not abuse its discretion by entering judgment on the merits against Bedwell on both Bedwell's complaint and the claim and counterclaim against Bedwell. We also conclude that the district court's refusal to hold an adversary hearing to determine damages was not improper. On the basis of Bedwell's discovery abuses, the district court had entered an order precluding Bedwell from producing evidence as to damages. Because that order was plainly justified on this record, and because giving effect to it would render any hearing on damages meaningless, the district court's assessment of damages will also be affirmed. We note in this regard that the excluded evidence pertained to cost of completion which was the major area of the discovery abuse; that cost of completion comprised 97% of the damages; that the district court had ample evidence to calculate damages; and that pursuant to leave of court, Bedwell filed an extensive brief countering the Trustee's damage submissions.

We begin with a description of the facts and procedural history of the case; unfortunately they are complicated and, because their full recitation is necessary to an understandable discussion, our description must be extensive.

## I. FACTS AND PROCEDURAL HISTORY

Bedwell was the general contractor on a project to construct a Preliminary Treatment Building and New Sludge Digestion and Gas Facility at the City of Philadelphia's Northeast Water Pollution Control Plant. In December, 1981 Bedwell entered into two subcontracts for masonry work

1. *Poulis v. State Farm Fire & Casualty Co.,* 747    F.2d 863 (3d Cir.1984).

with Hennelly. The subcontracts provided that Bedwell would make monthly progress payments to Hennelly under a cost breakdown schedule as the masonry work was performed.

The parties contracted for two types of bonds regarding the masonry work. First, the subcontracts between Bedwell and Hennelly provided that completion of the masonry work would be guaranteed by performance and payment bonds ("the subcontract bonds"), which were written for Hennelly by appellee International.[2] Second, because the project was financed by the City of Philadelphia, Bedwell, as general subcontractor, was required to enter into payment bonds to insure the payment of claims by Hennelly's suppliers and employees ("the Philadelphia payment bonds"). *See* Pennsylvania Public Works Contractors' Bonds Law, 8 Pa. Cons. Stat. Ann. §§ 191–202 (Purdon Supp.1987).

These interrelated commitments came to the fore in November, 1982 when Hennelly, asserting that Bedwell had failed to make timely progress payments as required by the subcontract, walked off the job. Bedwell contended, however, that the failure to make payments occurred because Hennelly had failed to construct certain portions of the project and had failed to make timely payments to its employees and suppliers, rendering Bedwell obligated to make payments under the Philadelphia payment bonds. Bedwell therefore treated Hennelly's abandonment of the projects as a breach of contract and sought payment from International under the subcontract bonds.

Bedwell then hired as counsel Matthew S. Donaldson, Jr. ("Donaldson"), who filed a complaint on its behalf in November, 1983, alleging that International had refused to perform its obligations under the subcontract bonds. A complicated exchange of pleadings followed, only part of which relates to this appeal. International filed a third party complaint against Hennelly and John and Margaret Hennelly ("the individual Hennellys"), asserting contractual and common law indemnification claims. *See supra* note 2. Hennelly and the individual Hennellys counterclaimed against International and claimed against Bedwell: (1) for outstanding payments due under the subcontract agreement; and (2) for the destruction of Hennelly as a going concern, which allegedly resulted from Bedwell's failure to make payments. Bedwell, in turn, filed a counterclaim against Hennelly. Subsequently, Hennelly filed a petition for protection under Chapter 11 of the federal Bankruptcy Code and is now represented by the Trustee.

The pleadings raised two major questions for exploration by discovery. First, which party, Bedwell or Hennelly, first materially breached the terms of the subcontract?[3] Second, what was the cost of completing the masonry work begun by Hennelly and completed by Bedwell?[4]

Discovery began in January, 1984 with a broad request by International to Bedwell for, *inter alia*, production of all documents relating to the cost of completion of the masonry work. International served the requests upon Bedwell's attorney, Donald-

---

**2.** Hennelly and International also entered into an indemnity agreement whereby Hennelly and John and Margaret Hennelly agreed to indemnify International for any losses sustained by International in making good on the subcontract bonds. John J. Hennelly was president of Hennelly, Inc. Margaret Hennelly is John J. Hennelly's wife. The record does not reveal whether or not Mrs. Hennelly was at any time an officer of the company.

**3.** If Bedwell materially breached, Hennelly could justifiably have walked off the job; if Hennelly materially breached, Bedwell would have

no liability (except for prior unpaid bills) and International would be liable under the subcontract bonds.

**4.** According to Article 10 of the subcontract agreement, the measure of damages is equal to the total of the subcontract price minus the amount already paid as progress payments by Bedwell to Hennelly, minus the reasonable cost of completing the masonry work. Since the first two items were readily ascertainable, the cost of completion became the central focus of discovery requests related to damages. *See also* Subcontract Performance Bond, J.A. at 97.

son, who forwarded them to Bedwell in February, 1984. Thomas Bedwell, president of Bedwell, then compiled the documents that constituted Bedwell's response and submitted them to International in April, 1984. The next significant discovery occurred on October 3, 1984 when International deposed Thomas Bedwell. As a result of the deposition, International determined that more documents existed regarding the cost of completion than had been produced in response to the January, 1984 request. Specifically, International determined that certain documents relating to communications with the City of Philadelphia, the notes of Bedwell's project manager Shashi Mody regarding Hennelly's masonry work, and other cost of completion documents should have been produced.

On October 15, 1984 International served its first set of interrogatories on Bedwell, requesting identification of every person with knowledge of the allegations in the complaint and seeking expert witness information. Answers to the interrogatories were due within 30 days, on November 15, 1984. *See* Fed.R.Civ.P. 33(a). International also filed a second request for document production on October 15, requesting all documents corresponding to the answers to the first set of interrogatories.

November 15 passed without Bedwell producing either the documents identified at the October 3 deposition, which International contends Bedwell should have produced in response to the January request for production, or answers to the first interrogatories. On November 21, 1984, International moved pursuant to Fed.R.Civ.P. 37(a) to compel production of these documents.

On December 3, before the court had acted on the motion, Bedwell supplied International with 524 pages of documents, including certain communications with the City of Philadelphia. However, the response did not include Mr. Mody's notebooks, which Bedwell claimed were "personal." Moreover, Bedwell failed to supply

additional cost of completion information. Also on December 3, International moved to compel answers to its October 15 first set of interrogatories and served a second set of interrogatories seeking answers and identification of documents related to cost of completion. These answers were due January 3, 1985, but were not filed until January 10, 1985. International has argued that these answers were incomplete, that they contained material inaccuracies, and that Bedwell's promises to cure these deficiencies were never fulfilled.

Bedwell did not respond to International's motion to compel answers to the October 15 first set of interrogatories; instead, on December 14 it filed the answers themselves, which later were found by the district court to be incomplete. Reacting to the insufficiency of the answers, International filed, on December 18, a supplemental motion to compel answers.

The district court acted on International's motions on December 20 and issued two orders. First, finding that Bedwell had not provided cost of completion documents responsive to International's first document request (made in January), it ordered Bedwell to comply within five days. Second, the court ordered Bedwell to provide "full and complete" answers to the October 15 (first) set of interrogatories and to provide the documents requested in International's second document request within seven days. The court explicitly warned Bedwell to comply with the order "or suffer sanctions." J.A. at 1414.

The events that occurred between the December 20 orders and a discovery conference on January 2, 1985 are the subject of heated dispute. On December 20, the same day the orders issued, the court called Donaldson to inform him of its decision on the motion to compel and its deadlines for providing the information. Subsequently, Donaldson attempted to reach Thomas Bedwell by telephone to inform him of the court's decision.[5] However, Thomas Bedwell was on vacation in Florida

---

**5.** Both Thomas Bedwell and Donaldson testified that Donaldson called Thomas Bedwell's office

and left messages on December 20, 21, and 26.

and Donaldson did not speak to him until he returned on January 2, 1985. Thomas Bedwell maintained that he had returned Donaldson's phone call on Friday, December 21 but, after being told that Donaldson was occupied with an office Christmas party, assumed that the message was unimportant.

Bedwell also maintained that during this time (i.e., from December 12, 1984 until January 2, 1985), because of an alleged death threat to Donaldson's mother, Donaldson had effectively withdrawn from the case.[6] As a result, Bedwell claims that it was wholly uninformed as to the seriousness of the developing discovery problems. Ultimately, the district court found that both counsel and the plaintiff itself were exceedingly lax about contacting one another during this period, and that, as a result, they both disregarded the discovery deadlines imposed by the court's order of December 20.

Also during the month of December, 1984, International attempted to resume the deposition of Thomas Bedwell, and to depose Curtis Bedwell, chairman of the board of Bedwell, and project manager Shashi Mody. Although the exact interactions between International's counsel and Donaldson and between Donaldson and his client Bedwell regarding the depositions are in dispute, the court found that International and Donaldson scheduled and, at Thomas Bedwell's insistence, were forced to reschedule depositions of Curtis Bedwell and Mody.[7] Mody failed to appear at a December 27 deposition but finally was deposed on January 18, 1985. International argues that at that time "he divulged the existence of numerous documents which [Bedwell] had not previously produced." Appellee's Br. at 29. On appeal, Bedwell contends that Donaldson never informed the Bedwells and Mody of the pendency of their depositions and scheduled the depositions without checking in advance to see if they were available.[8] However, at a January 2, 1985 discovery conference Donaldson argued that the absences were due to vacations and previous business commitments.

International met with additional difficulties in its attempts to depose Curtis Bedwell. Donaldson informed International in early December that Curtis Bedwell could not be deposed for health reasons, but Donaldson never moved for a protective order under Fed.R.Civ.P. 26(c). International filed a motion to compel on December 20, 1984, and Donaldson responded at the January 2 discovery conference by presenting a letter from Curtis Bedwell's doctor. As the district court noted, however, under the terms of the letter, even if Curtis Bedwell was unfit to testify in court, he could be deposed under appropriate conditions.

After Bedwell failed to comply with the five and seven day deadlines imposed by the district court in its December 20 orders, International moved for sanctions on December 27, and on December 28 moved to compel full answers to its first set of interrogatories. In response to the ongoing discovery problems, the court held the January 2 discovery conference. At the conference Donaldson submitted the documents due on December 27 and, according to the court, advanced "the unbelievable argument" that the additional documents need not be produced because he had earlier permitted International's counsel access to other, different documents. J.A. at 1405. Donaldson also offered excuses for the failures of Curtis Bedwell and Shashi Mody to appear at their scheduled depositions. At that time the court directed Donaldson to

---

6. Donaldson testified that his mother had received a death threat, and for this reason he did not play an active role in the prosecution of the case during this time period. The suspected origin or nature of the threat is not fleshed out in the record and the district court's opinion does not make findings on this aspect of the matter.

7. The depositions had to be rescheduled at the last minute, at least in part because Thomas Bedwell demanded to be present at Mody's deposition, yet was frequently unavailable.

8. International counters that Thomas Bedwell's schedule book from December 18, 1984 includes a notation regarding Mody's deposition, with the word "postponed" written over it, indicating that Thomas Bedwell *was* informed of the depositions in advance. Appellee's Br. at 28 n. 30.

have Bedwell produce Mody's notebooks promptly. Donaldson testified that he informed Thomas Bedwell of the court's orders the same day.

Also on January 2, Bedwell filed amended answers to the first set of interrogatories. However, according to International, these amended answers were not "full and complete," and although Donaldson apparently agreed to provide supplemental answers, they were never provided. On January 3, International resumed the deposition of Thomas Bedwell.

On January 14 the district court announced that sanctions would follow shortly and issued orders enforcing its December 20 orders. The court ordered Mody and Curtis Bedwell to make themselves available for their depositions.[9] In addition, the court extended International's discovery period for 30 days, but refused to extend Bedwell's discovery period.

On January 16, 1985, International resumed the deposition of Thomas Bedwell, and on January 18, International deposed Shashi Mody, with Thomas BedweU in attendance. Although Donaldson had told Thomas Bedwell of the need to produce Mody's notebooks promptly, it was not until January 22 that Thomas Bedwell finally delivered them by giving the notebooks to Donaldson on the day Donaldson was to take the deposition of an International employee.[10] Donaldson testified that he had refused to attend the deposition without the notebooks. During this period Donaldson also informed Thomas Bedwell that he

wanted "to get out of this case," J.A. at 3804, and that Bedwell should settle the claims with International if possible. Settlement negotiations were held during the week of January 23, but broke down on January 25, and no settlement was reached.

During a telephone conversation following the breakdown of settlement negotiations on January 25, International informed Bedwell of its intent to resume its scheduled deposition of Thomas Bedwell on January 28. International refused Bedwell's request to again reschedule Thomas Bedwell's deposition. Commenting on this refusal, Curtis Bedwell, in a telephone conversation, remarked "[t]he court will just have to give us more time." J.A. at 1639.

On January 28, Thomas Bedwell told Donaldson at 8:00 a.m. that he would attend the deposition, then discharged Donaldson at 9:15 a.m. Although Donaldson, aware of the court's displeasure with Bedwell's discovery behavior, appeared at the site of the scheduled deposition, Thomas Bedwell failed to attend the deposition. Instead, as Thomas Bedwell admits, he directed his secretary to call and tell International that he was sick and would not be able to attend. The court found, and Bedwell does not dispute, that International hired private investigators who gathered information indicating that Thomas Bedwell was not sick on January 28. With direct reference to these events, the court later expressed displeasure with Thomas Bedwell's attitude toward the litigation.[11] The dis-

---

9. The court stated that the condition of Curtis Bedwell's health should be evaluated and proper steps taken to accommodate it.

10. Thomas Bedwell testified at a February hearing that he had never actually reviewed the project manager's notebooks, despite his claim that they were personal.

11. The court specifically quoted an exchange between International's counsel and Thomas Bedwell at the February hearing:

At the hearing Mr. Bedwell testified, under cross-examination as follows:
Q. [Mr. Borish] And in fact, were you in the room with [Curtis Bedwell] on January 25th when I spoke to him via the speaker phone and told him that your deposition would proceed on January 28th.
A. [Mr. Bedwell] Yes.

Q. When your secretary called me on January 28th and told me that you couldn't attend the deposition because you were sick, that wasn't true, was it?
A. She called you. That is true.
Q. Was it true that you were sick?
A. I didn't feel well, but I was well enough to work.
Q. Were you well enough to attend a deposition?
A. Yes.
Q. So is it your testimony that in order to deal with the predicament in which you found yourself on January 28, you had one of your subordinates call me and lie to me?
A. She called you and told you I was sick?
Q. And that was a lie; wasn't it?
A. I was sick.
J.A. at 3798–99.

trict court found that "[t]his excerpt [quoted in the margin] reflects Mr. Bedwell's overall demeanor and attitude during the [February] hearing and during the course of this litigation." *Id.* at 1382.

In response to Thomas Bedwell's failure to appear and the other discovery problems, International filed a third sanctions motion on January 29, 1985, seeking dismissal of Bedwell's complaint and attorneys' fees. Bedwell hired new counsel the next day, and on February 1, new counsel received Donaldson's files. Under the direction of new counsel, Bedwell began producing additional documents and made employees available for depositions.

On February 11 the district court filed a memorandum supplementing the opinions of December 20 and January 14. The court stated that Bedwell was continuing to impede the progress of the case, and fined Bedwell $2,000.

In response to International's January 29 third sanctions motion, the court held an evidentiary hearing on February 22 and 25 regarding whether Bedwell should be subject to further sanctions because of its ongoing discovery abuses. The district court held the matter under advisement until October 9, 1985 when the court, pursuant to Rule 37, dismissed Bedwell's complaint against International and counterclaim against the Trustee, and entered judgment by default on liability against Bedwell on the Trustee's and the individual Hennellys' claims.

The district court established liability against Bedwell by default on the Trustee's and the individual Hennellys' claims because the key issues of their claims and Bedwell's counterclaim against the Trustee were the obverse of one another: who breached the subcontract, and who owed whom under the subcontract? As a result, the district court concluded that finding for the Trustee and the individual Hennellys necessitated *both* dismissal of Bedwell's claim and finding liability against Bedwell on the Trustee's and the individual Hennellys' claim.

The court ordered the Trustee and the individual Hennellys to submit damages assessment memoranda with evidentiary support and further ordered that "[i]f a hearing is necessary, the Court will schedule it after receipt of the above papers. Plaintiff shall be precluded from submitting any evidence on its claimed cost of completion of the masonry subcontracts at issue." J.A. at 1398.

■■■■ Following submission of damages assessment memoranda, but without holding an evidentiary hearing or permitting Bedwell to introduce countervailing evidence on damages, the district court on September 5, 1986 determined the damages on the Trustee's and the individual Hennellys' claims.[12] The court resolved two damages issues: (1) the amount owed to the Trustee under the subcontract ("the subcontract amount"); and (2) the value of the equipment, machinery, and tools that Bedwell failed to return promptly to the Trustee.[13]

---

**12.** The district court also granted International's motion for summary judgment against the Trustee and the individual Hennellys on the issue of third party indemnification raised in their counterclaims. This counterclaim alleged that International had failed to perform a duty to ensure completion of the subcontract under the subcontract performance bonds. The district court dismissed the counterclaim on the ground that the bonds were effective only if Hennelly was the party that breached the subcontract, and the October 9, 1985 order established that Bedwell was the breaching party. The court further found the individual Hennellys and the Trustee liable to International under the indemnity agreement.

**13.** In addition, the district court declined to award damages on the Trustee's and individual

Hennellys' destruction of business or "going concern" claim. The Trustee had claimed that Bedwell was liable for the value of Hennelly as a going concern, but the court rejected that claim on the ground that the Trustee and the individual Hennellys did not produce sufficient evidence to demonstrate that Bedwell's breach of the subcontract caused the destruction of Hennelly, and because the evidence did not establish the value of Hennelly as a going concern with a sufficient degree of certainty.

Via his cross-appeal, the Trustee seeks to reverse the district court's decision not to award damages on the claim, maintaining that the district court abused its discretion in failing to award damages. We disagree, and will affirm the district court's decision not to award destruction of business damages.

With respect to the subcontract amount, the district court determined that Bedwell owed Hennelly $592,309. Under the terms of the subcontract, damages are to be determined by the difference between the total subcontract price and the reasonable cost of completion, less the amount already paid under the subcontract as progress payments.[14] The court determined the subcontract damages as follows:

| | | |
|---|---|---|
| 2,500,000 | total subcontract price (Sludge Digestion Facility and Preliminary Treatment Building) | |
| — 1,734,572 | total Bedwell paid Hennelly | |
| 765,428 | unpaid amount | |
| — 173,119 | reasonable cost of completion | |
| 592,309 | total owed to Hennelly | |

The court determined the subcontract price from the face of the document. To determine the "reasonable cost of completion" figure, the district court adopted the bid of Damar Masonry Company, Inc. ("Damar") to complete the masonry work for $173,1199. Damar's offer had been approved by the bankruptcy court supervising Hennelly's reorganization, but had been rejected by Bedwell.

Second, concerning items left at the facilities when Hennelly walked off the construction site, the district court found that the Trustee was entitled to damages of $24,196 "for the value of equipment, machinery and tools not returned by Bedwell in a timely manner." J.A. at 1367 (citations omitted). To arrive at the $24,196 figure, the district court subtracted the amount received at auction for items sold by the Trustee after their return ($3,100) from the fair market value of the equipment ($27,596).

In sum, the district court awarded the Trustee $616,505 in damages for the subcontract and equipment claims, plus interest.[15] Bedwell appeals from the district court's dismissal of its claim and counterclaim, from the court's finding of liability against it on the Trustee's and the individual Hennellys' claims, and from the September 5, 1986 order assessing damages against Bedwell without allowing Bedwell to present evidence.[16] We turn first to the dismissal and fixing of liability on the claim and counterclaim.

## II. THE SANCTIONS JUDGMENT DETERMINING LIABILITY

### A. *The Applicable Law*

The district court dismissed Bedwell's complaint and rendered a default judgment against it under Fed.R.Civ.P. 37(b)(2), which provides in pertinent part,

Sanctions by Court in Which Action is Pending. If a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders

Under Pennsylvania law, lost income or profit damages are recoverable, but only where they can be proved with reasonable certainty. *See Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 126, 464 A.2d 1243, 1261 (1983). The record supports the district court's determination that the single affidavit of Hennelly's expert accountant was insufficient to establish that the bankruptcy of Hennelly was the reasonable and foreseeable result of Bedwell's breach. The record indicates that Hennelly may have been in financial difficulty before Bedwell ceased payments on the subcontract, and further, that the expert's affidavit, which states "that the majority of the books and records for the time period ending December 31, 1982 were not available," J.A. at 860, was based on discussions with Hennelly's attorney and with John J. Hennelly rather than on an evaluation of the books and records for that crucial time period.

14. Under the subcontract, Bedwell made regular progress payments for the work completed, less 10% retainage.

15. The court assessed against Bedwell the legal (Pennsylvania) rate of interest (6%) on the damages beginning December 20, 1982, the date on which Hennelly, Inc. notified Bedwell in writing that Bedwell was in breach.

16. In addition, the Trustee cross-appeals from the district court's September 5 order insofar as it denied the Trustee's destruction of business claim. *See supra* pages 689–90 n. 13.

in regard to the failure as are just, and among others the following:

. . . . .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;....

Rule 37(d) provides that in the event of a failure to appear for a deposition or to serve answers to interrogatories, the court "may make such orders in regard to the failure as are just" including the actions described under 37(b)(2), or may require the payment of reasonable expenses.

■ Dismissal under Fed.R.Civ.P. 37 is a matter for the discretion of the district court. *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976) (per curiam). We review the dismissal for abuse of discretion, *see Carter v. Albert Einstein Medical Center*, 804 F.2d 805, 807 (3d Cir.1986); *Ali v. Sims*, 788 F.2d 954, 957 (3d Cir.1986). We review the district court's findings of fact on a clearly erroneous standard. *See Ellis v. Ringgold School Dist.*, 832 F.2d 27, 29 (3d Cir.1987).

In *National Hockey League v. Metropolitan Hockey Club, Inc.*, the Supreme Court reversed a decision of this court and held that the district court did not abuse its discretion in dismissing a complaint under Rule 37 where the district court had found that the plaintiff demonstrated " 'flagrant bad faith' " and its counsel's conduct amounted to " 'callous disregard' of [his] responsibilities." 427 U.S. at 643, 96 S.Ct. at 2781. The Supreme Court noted that although the party before the appellate court may be chastened by the dismissal granted by the lower court and hence may be likely to comply with future discovery orders, the deterrent effect of sanctions on other parties should not be underestimated lest "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *Id.*

at 643, 96 S.Ct. at 2781. The Court firmly stated the need for deterrence:

There is a natural tendency on the part of reviewing courts, properly employing the benefit of hindsight, to be heavily influenced by the severity of outright dismissal as a sanction for failure to comply with a discovery order. It is quite reasonable to conclude that a party who has been subjected to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal, he will nonetheless comply promptly with future discovery orders of the district court.

But here, as in other areas of the law, the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*Id.* at 642–43, 96 S.Ct. at 2780–81.

In *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863 (3d Cir.1984), we examined the factors that must be considered in determining whether the district court properly exercised its discretion in ordering an extreme discovery sanction. *See also Scarborough v. Eubanks*, 747 F.2d 871, 875–78 (3d Cir.1984) (applying *Poulis* factors to Rule 41 default judgment). The six factors identified in *Poulis* are:

(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

747 F.2d at 868 (emphasis omitted).[17]

The district court in the case *sub judice* balanced the six *Poulis* factors to deter-

17. This court has upheld Rule 37 dismissals for a variety of discovery abuses. *See Poulis* (dis-

mine whether dismissal was the appropriate sanction. To determine whether the district court abused its discretion, "[w]e will be guided by the manner in which the court balanced the *Poulis* factors and whether the record supports its findings." *Ali v. Sims*, 788 F.2d at 957.

### B. *Application of the Poulis Factors*

#### 1. *Bedwell's Personal Responsibility*

■ The district court found that "plaintiff here, through its president Thomas Bedwell, shares some of the responsibility (with prior counsel) for the repeated discovery abuses and violations of court orders." J.A. at 1384. First, the court found that Thomas Bedwell shared responsibility for a number of abuses of the deposition process. It found that Thomas Bedwell had his secretary call counsel for International on the morning of the January 28 deposition to say he was ill and could not attend the deposition, when, in fact, he was fully able to attend the deposition, but had fired Donaldson and did not wish to attend without counsel. In addition the court found that the frequent rescheduling of Thomas Bedwell's deposition was the result of his personal unavailability, and that Thomas Bedwell's insistence on being present at project manager Shashi Mody's deposition led to Mody's repeated unavailability.

Second, the district court found that Thomas Bedwell was responsible for Bedwell's failure to produce Mody's notebooks detailing the costs of completion. The court found that Donaldson told Thomas Bedwell in early January, 1985 that the court had ordered production of the notebooks, yet Bedwell did not release them to Donaldson until Donaldson refused to attend a deposition without them.[18] The court further noted Thomas Bedwell's concession that "neither he nor Mr. Mody had ever reviewed the notebooks to determine any basis for refusing to produce them." J.A. at 1384.

Third, the court found that Thomas Bedwell had a "lax attitude" about the discovery process which was "demonstrated by Thomas Bedwell's unenthusiastic attempts to return Donaldson's Christmas-period telephone calls and his evasiveness during the February hearing." J.A. at 1385–86. Moreover, the district court found that Thomas Bedwell admitted that he knew of the January 2, 1985 conference in chambers and of the court's reprimand over prior discovery abuses.

Bedwell argues that the district court's findings regarding personal responsibility are clearly erroneous. Bedwell attempts to place total responsibility on Donaldson, maintaining that it was neither aware of nor responsible for the discovery abuses because Donaldson never informed it of International's discovery requests, of discovery deadlines, or of the district court's scheduling and other discovery orders. Bedwell argues that it gave documents to Donaldson when requested to do so, and that Shashi Mody and Bedwell failed to appear for their depositions in December because Donaldson scheduled the depositions without clearing the dates with Mody and Bedwell in advance. Bedwell further asserts that it is not responsible for Curtis Bedwell's failure to appear because it requested Donaldson to file the necessary protective papers. In short, Bedwell argues that Donaldson abandoned his client, and that it should not be responsible for actions that arose from Donaldson's abandonment. We disagree.

The district court's detailed findings of Thomas Bedwell's personal responsibility for repeated deposition abuses and failure to produce documents are supported by the record and demonstrate that Bedwell and its officers shared responsibility with Donaldson, rather than that Bedwell was an unknowing client abandoned by its attor-

---

missal not an abuse of discretion after plaintiffs' failure to file answers to interrogatories and late filing of pre-trial statement); *Al Barnett & Son, Inc. v. Outboard Marine Corp.*, 611 F.2d 32, 36 (3d Cir.1979) (dismissal not an abuse of discretion after plaintiffs' failure to appear at deposition and failure to obey court orders to answer interrogatories).

**18.** The court made a specific finding that Donaldson's testimony as to his refusal to attend the deposition without the notebooks was credible.

ney.[19] The court's finding that Thomas Bedwell knew of the January 2, 1985 conference in chambers and the court's reprimand was based on an admission by Thomas Bedwell at the February, 1985 evidentiary hearing. The finding that Thomas Bedwell knew of the court's orders, coupled with its finding that Thomas Bedwell's insistence on being present at Mody's deposition led to the repeated rescheduling and Mody's failure to appear, refutes Bedwell's argument that it was left totally in the dark by Donaldson. Further, factors in the record such as Curtis Bedwell's remark to International's counsel that "[t]he Court will just have to give us more time," J.A. at 1639, Bedwell's refusal to produce the project manager's notebooks, and its attempt, under questionable circumstances, to excuse Curtis Bedwell from being deposed indicate that this is not simply a case of an attorney abandoning his client.[20]

In sum, the record fully supports the district court's determination that the first factor of the *Poulis* test, shared responsibility between Bedwell and Donaldson, was met. *See also Ennis v. New Jersey Bell Telephone Co.,* 782 F.2d 396, 397 (3d Cir. 1985), *cert denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986) (personal responsibility component of *Poulis* test met where party was aware of counsel's prior inability to comply with court rules).

## 2. *Prejudice to Opponent*

The district court found that Bedwell's discovery abuses "severely prejudiced" the appellees by depriving them of important information and by forcing appellees to expend costs in obtaining court orders to force Bedwell to comply with discovery requests. J.A. at 1388.

On appeal, Bedwell does not dispute the finding that appellees were forced to expend costs to obtain compliance, but contends that future discovery merely would be cumulative. Alternatively, Bedwell attempts to evade the finding of prejudice by noting that it replaced its counsel after becoming aware of the abuses and by pointing out that new counsel has complied with all discovery orders and requests, and will continue to do so. Bedwell maintains that because Donaldson conducted very little discovery on behalf of his client, it, not the other parties, was the true victim of the discovery abuses.

Moreover, Bedwell submits that the district court should not have dismissed its claim and granted judgment against it on the Trustee's claim unless the harm to the other parties amounted to "irremediable prejudice" that could not be "alleviated by [the] court's reopening discovery and postponing trial." *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 110 F.R.D. 363, 369 n. 14 (D. Del.1986) (emphasis omitted). We disagree. In *Poulis,* the district court's determination that the plaintiff's conduct prejudiced the adversary was supported by the record where "interrogatories were never answered nor were objections filed; defense counsel was obliged to file a motion to compel answers, and was obliged to file its pre-trial statement [before plaintiffs filed their pre-trial statement]." 747 F.2d at 868 (citation omitted). In *Scarborough v. Eubanks,* filed on the

---

**19.** In *Dunbar v. Triangle Lumber and Supply Co.,* 816 F.2d 126, 129 (3d Cir.1987), we set forth the need to notify the client of his counsel's misconduct in order to enable the client to protect himself from the attorney's discovery abuses. Here, the district court's January, 1985 conference and February, 1985 hearing effectively notified Bedwell of Donaldson's actions. In *Dunbar,* we also encouraged the district court to make findings supported by the record that the client personally bore some responsibility for his attorney's actions before dismissing for failure to prosecute under Fed.R.Civ.P. 41(b). 816 F.2d at 129. As is noted above, that was done.

**20.** International contends that the doctor's letter excusing Curtis Bedwell was four years old, and indicated that Curtis Bedwell was unfit to appear in court, but did not indicate that he was unfit to be deposed, and that notwithstanding his protestations about his health, Curtis Bedwell actively participated in the litigation for Bedwell. *See* Appellee's Br. at 30–31. The record supports International's contention that the doctor's letter was four years old, and the district court expressed "dismay" that despite Bedwell's protestations about Curtis Bedwell's health, he may have been healthy enough to have actively participated in the litigation. J.A. at 1380.

694

same day as *Poulis*, the panel rejected a similar dismissal under Fed.R.Civ.P. 41 and noted that the record demonstrated "no effort" by the parties claiming prejudice to use the available discovery methods to avoid being prejudiced. 747 F.2d at 877.

In contrast to the parties claiming prejudice in *Scarborough*, International vigorously pursued the available discovery methods to avoid being prejudiced, including filing six discovery motions with the district court. Furthermore, the district court's finding that appellees were deprived of important information is supported by the fact that the documents continued to trickle in after the court's second discovery deadline.[21] That finding is not clearly erroneous. Moreover, the prejudice factor is not the primary basis of the requested relief but only one of the six *Poulis* factors. Because the prejudice to appellees arising from the conduct of Bedwell, including the failure to make the notebooks available and the costs incurred by appellees in obtaining discovery orders, at least matches the conduct that was presented to the *Poulis* court, we do not find the district court's determination of prejudice to be an abuse of discretion.

### 3. History of Dilatoriness

The district court found that Bedwell's discovery delays amounted to a "pattern of abuse" that exceeded those found in *Poulis*. In *Poulis*, one failure to answer interrogatories and a failure to file a pretrial statement were sufficient to support a dismissal. Here, on the other hand, the district court noted that the discovery abuses amounted to "far more extensive lapses over an extended period of time." J.A. at

1388. The record on appeal demonstrates a significant pattern of delay, including failure to comply fully with document requests evidenced by Bedwell's continued delivery of documents after the court's second discovery deadline, failure to answer fully International's expert interrogatories, and repeated failures by Mody and Thomas Bedwell to attend depositions, which actions necessitated repeated motions to compel.

Bedwell argues that the delay here resembles the delay in *Ali*, which we found insufficient to support the dismissal of a complaint. In *Ali*, the district court *sua sponte* entered an order pursuant to Rule 37(b) deeming the factual allegations of plaintiff Ali's complaint admitted. 788 F.2d at 956. The history of dilatoriness consisted of a total failure by government officials to respond to Ali's discovery requests. However, in *Ali* this court's reversal of the district court's grant of partial summary judgment did not turn on the length of the delay involved. The failure to respond to discovery requests was a result of a change of counsel, and there was no finding of party responsibility or that the conduct indicated willfulness or bad faith. We determined that "[e]ven if there was inexcusable delay, the other *Poulis* factors suggest that the severe sanction was inappropriate." 788 F.2d at 957–58. In addition, the *Ali* panel noted that the district court had made no balancing of the *Poulis* factors.[22]

Thus, we conclude that the *Ali* decision is inapposite on the issue of dilatoriness. In any event, the record supports the district court's finding that a pattern of delays in excess of that held sufficient to support a dismissal in *Poulis* was present here.

---

**21.** Without deciding the issue, we note that International argued to the district court that documents were still outstanding at the time of the February, 1985 evidentiary hearing. International argued that Bedwell had "front end loaded" its bills to the City of Philadelphia and that Bedwell was withholding documents that might support that conclusion. According to International, "[i]t is our contention that Mr. Bedwell billed the City at the front of this contract, at the beginning of the contract, for more work than actually had been done, to get more money from the City at that point." J.A. at 4035. International contended that because Bedwell allegedly overbilled the City early in the contract, it had to underbill the City for Hennelly's ma-

sonry work, which was performed later in the construction process.

**22.** Bedwell also cites *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 110 F.R.D. 363 (D.Del.1986), and *George V. Hamilton, Inc. v. Everett Co., Inc.*, 104 F.R.D. 106, 110 (W.D.Pa.1985). We find *Coca–Cola* and *George V. Hamilton* to be inapposite. In *Coca–Cola* no allegation of a history of dilatoriness was made at all. 110 F.R.D. at 369. In *George V. Hamilton* a delay of 14 months was held to be intolerable, but the court suggested no minimum period for delay. 104 F.R.D. at 110.

#### 4. *Party or Attorney Conduct Demonstrating Bad Faith*

The district court found that Bedwell's first counsel, Donaldson, willfully failed to comply with three court orders, and to comply with outstanding discovery requests, and failed to advance plausible reasons for the failures. Further, the court found that "to the extent [Thomas] Bedwell was responsible, he too acted willfully, not as a result of negligence or other reasonable excuse." J.A. at 1389.

With regard to Donaldson, there is evidence in the record supporting the court's finding that Donaldson failed to respond to court orders and legitimate discovery requests and to procure key personnel for depositions. The evidence suggests that much of Donaldson's behavior was not willful, but may have been attributable to a perceived threat to a family member.[23] Nevertheless, because the discovery abuses began before and continued after the period of the perceived threat and because the district court was uniquely competent to make a determination of willfulness after interacting with Donaldson at several discovery conferences and with Thomas Bedwell at the February hearing, we cannot hold that the court's finding of willfulness is clearly erroneous.

Bedwell maintains that because of Donaldson's "abandonment," it was not aware of its responsibilities and thus that its conduct was not willful or in bad faith. However, Thomas Bedwell admittedly was aware of the January 2, 1985 conference at which Bedwell's discovery failures were discussed, yet continued to demonstrate intransigence. The January 28 phone call to International's counsel falsely claiming that Thomas Bedwell was ill and could not attend the scheduled deposition is a further indication of bad faith. All in all, the record supports the district court's finding of bad faith.

#### 5. *Alternative Sanctions Available*

The district court imposed three lesser sanctions before dismissing Bedwell's complaint: (1) a limitation of Bedwell's time period for discovery responses issued on January 14; (2) a unilateral extension of International's discovery deadline also issued on January 14; and (3) a $2,000 sanction against Bedwell issued on February 11, 1985. Bedwell argues on appeal, as it argued before the district court, that the lesser sanctions achieved the desired effect—it began to comply fully with discovery orders as soon as it dismissed Donaldson on January 28, 1985—and that further sanctions are unnecessary. With the exception of Thomas Bedwell's failure to appear at his deposition after firing Donaldson on January 28, Bedwell contends that its cooperation indicates a willingness to mend its discovery-abusing ways. Bedwell further asserts that after hiring new counsel, it supplied 2,000 pages of documents to International, and that Bedwell made its employees available for depositions. Neither International nor the Trustee has faulted the new counsel's conduct of the case in any respect.

The court, however, found that the prior, less severe sanctions did not deter discovery abuses. The court observed that replacing Bedwell's attorney would be insufficient to prevent further abuses because it was "convinced that a significant part of the responsibility for the problems to date rests with [Bedwell]." J.A. at 1389–90. The court carefully considered the impact of Bedwell's hiring new counsel and determined that because of Bedwell's substantial responsibility for the earlier discovery abuses, future abuses could be expected to occur. Although Bedwell's compliance with discovery orders improved significantly after it retained new counsel, the record supports the court's determination that such improvements were too little, too late and that one main source of abuse, Thomas Bedwell, still remained.

In determining the appropriate sanction, the court also reviewed untried alternative sanctions. First, it found that because discovery abuses related to key damages issues, merely precluding testimony in areas

---

**23.** *See supra,* note 6.

where Bedwell had abused the discovery process would be tantamount to a dismissal, and would "simply result in the delay of an entry of judgment in favor of International and against [Bedwell]." J.A. at 1390. Second, the court noted that it could have imposed the other parties' full costs on Bedwell, but concluded that because the costs would be so large this, too, would amount to an effective dismissal of the case.

The parties' estimates in response to the panel's questions at oral argument as to the percentage of the discovery that related to damage issues varied widely (from 20% to virtually all). There is, however, no doubt that the cost of completion was the most significant disputed issue in the case. Although the district court's conclusions on this point may be excessive, we cannot say that the district court's determination that precluding testimony on this issue was not a viable alternative to dismissal was in error. We are supported in this conclusion by the fact that the record indicates that defendants filed six discovery motions to gain Bedwell's compliance with the discovery rules, in addition to taking numerous other actions, and that several lesser sanctions had already been imposed.

### 6. Meritoriousness of the Claim

In *Poulis*, we stated that "[a] claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense." 747 F.2d at 869–70 (citations omitted). The district court here determined that both sides' positions appeared reasonable from the pleadings and that an examination of meritoriousness "d[id] not appear to advance the analysis one way or another." J.A. at 1391.

Bedwell argues that the defendants in *Poulis* had a "compelling" defense, 747 F.2d at 870, and that, as a result, dismissal of the *Poulis* plaintiff's claim was appropriate, whereas dismissal here was inappropriate because the district court found that *both* parties made out *prima facie* cases. There is no indication, however, that in order to meet the meritoriousness factor supporting dismissal in *Poulis* the defense

must be compelling and, at all events, one *Poulis* factor is not controlling. The meritoriousness factor here is neutral and not dispositive.

### 7. Summary of Poulis Factors

Although *Poulis* recognized that the sanction of dismissal is disfavored, the district court here made extensive findings and carefully weighed the *Poulis* factors, and the record does not indicate an abuse of discretion. The first five *Poulis* factors all support dismissal here, particularly the finding that Bedwell shared personal responsibility with Donaldson, and the sixth factor, the meritoriousness of the claim, is neutral. Thus, even though the sixth factor does not advance the analysis, the balance of factors strongly supports the district court's dismissal and fixing of liability against Bedwell, which cannot be viewed as an abuse of discretion.

Moreover, the deterrent function of Rule 37 dismissal leads us to affirm. Bedwell argues that its discovery abuses should be attributed solely to Donaldson, that it was sufficiently chastened by the earlier discovery orders and by the threat of dismissal, and that with its new attorneys it will fully comply with future discovery orders. As the Supreme Court noted in *National Hockey League*, "[i]t is quite reasonable to conclude that a party who has been subjected to such an order will feel duly chastened, so that even though he succeeds in having the order reversed on appeal, he will nonetheless comply promptly with future discovery orders of the district court." 427 U.S. at 642–43, 96 S.Ct. at 2780–81. However, we are also mindful of the Supreme Court's further admonition that despite the likelihood that the appealing party will be chastened, the dismissal sanction "must be available" in order to achieve its important deterrent effects. *Id.* at 643, 96 S.Ct. at 2681.

For all the foregoing reasons, we will affirm the district court's dismissal of Bedwell's claim against International for payment under the performance bonds and Bedwell's counterclaim against the Trustee. Because the Trustee's and the individual Hennellys' claims and Bedwell's counterclaim were the obverse of one another,

*see supra* p. 689, we will also affirm the finding of liability by default against Bedwell on the Trustee's and the individual Hennellys' claims.

## III. ASSESSMENT OF DAMAGES

As we have explained above, the district court entered judgment against Bedwell on behalf of the Trustee, Hennelly, and the individual Hennellys under Rule 37(b)(2)(C), which permits entry of an order "rendering a judgment by default against the disobedient party." Fed.R.Civ.P. 37(b)(2)(C). The default judgment established Bedwell's liability and left two damage issues to be determined: (1) the subcontract amount (the amount owed to Hennelly under the subcontract); and (2) the value of the equipment, machinery, and tools not returned by Bedwell.[24]

To determine the amount of the damages arising from the default judgment, the district court allowed the Trustee to submit affidavits and briefs, and allowed Bedwell to file a brief in response, but did not hold a hearing on damages and did not permit Bedwell to introduce any evidence to support its contentions. The court then fixed damages against Bedwell at $616,505. On appeal, Bedwell argues that the district court erred by determining damages without permitting a hearing or providing Bedwell with a chance to present evidence, and therefore rendered a judgment based on unreliable information.[25]

Even assuming that the district court's consideration of Bedwell's brief did not afford it an adequate opportunity to challenge the Trustee's damage submissions, a doubtful proposition under the circumstances,[26] Bedwell's objection to the assessment of damages must fail, primarily because Bedwell has ignored the effect of the district court's order precluding it from producing evidence as to cost of completion

damage. Given Bedwell's egregious discovery misconduct described at such length above, that preclusion order was plainly justified. It centers on cost of completion which, as we have explained, was the area in which Bedwell obstructed and stonewalled.[27] Giving effect, as we must, to the district court's preclusion order would render any hearing on damages meaningless, and requiring a hearing on damages would in effect reverse the district court's order and undermine its authority without any showing that the district court abused its discretion or erred as a matter of law. As we have already held, the district court's detailed findings were amply supported.

The judgment of the district court will be affirmed.

---

**24.** The district court also considered and declined to award damages on the Trustee's and the individual Hennellys' "destruction of business" claim. *See supra* note 13.

**25.** However, we note in this regard that the Trustee submitted over 200 pages of affidavits and documentation and that the district court, in its memorandum opinion of September 5, 1988, carefully set out the evidence and calcula-

tions it used to ascertain damages, relying on the evidence submitted.

**26.** In response to the Trustee's documentation, Bedwell submitted a substantial reply memorandum accompanied by numerous exhibits.

**27.** Cost of completion in fact represented 97% of the damages awarded.