### In re AMERICAN FREIGHT SYSTEM, INC., Debtor.

### AMERICAN FREIGHT SYSTEM, INC., Plaintiff,

### v.

### INTERSTATE COMMERCE COMMISSION, an agency of the United States of America, United States of America, B.F. Goodrich a/k/a Uniroyal Goodrich Tire, Interplastic Company and Higbee Company, Defendants.

Bankruptcy No. 88–41050–11.
Adv. No. 94–7011.

United States Bankruptcy Court, D. Kansas.

Nov. 17, 1994.

Kurt Stohlgren, Kansas City, MO, for A.F.S.

Virginia Strasser, Washington, DC, for I.C.C.

Brendan Collins, Dept. of Justice, Washington, DC, for U.S.

Scott J. Goldstein, Kansas City, MO, for Uniroyal Goodrich.

Joseph M. Weiler, Topeka, KS, for Interplastic.

Anthony D. Clum, Topeka, KS, for Higbee.

Paul Hoffman, Kansas City, MO, for American Safety Razor.

### MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court to determine whether American Freight System, Inc. ("AFS"), is "no longer transporting property" within the meaning of 49 U.S.C. § 10701(f)(1)(A).

## JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O). The Negotiated Rates Act of 1993 also confers jurisdiction on this Court. 49 U.S.C. § 10701(f)(1).

## FINDINGS OF FACT

Plaintiff AFS, shipper/defendant Interplastic Company ("Interplastic"), and defendants Interstate Commerce Commission ("ICC") and the United States of America ("USA") stipulated in pertinent part as follows.

In 1991 the Court confirmed a Joint Plan of Reorganization of AFS and its parent company American Carriers, Inc., which subsequently changed its name to Anuhco. In connection with such Joint Plan, the Court approved a Disclosure Statement wherein AFS and Anuhco contemplated the joint acquisition and subsequent operation of a new business, and provided that in order to facilitate such acquisitions, Anuhco could request a loan from AFS up to an aggregate amount of $2.8 million. The Disclosure Statement further provided that AFS would engage in business following confirmation of the Plan.

Pursuant to the Joint Plan, AFS was to advance to Anuhco $50,000 per quarter for two years to help defray Anuhco's operating costs. In addition, Anuhco could employ AFS to render services, provided AFS's rates were competitive.

Prior to filing the Joint Plan, from 1989 through 1991, and thereafter, AFS and Anuhco acquired ownership of Crouse Cartage Company ("Crouse"). Crouse was a motor common carrier. AFS loaned Anuhco $2.8 million to facilitate the acquisition and in addition AFS purchased 3½% of Crouse's stock. Anuhco owned all other stock in Crouse. In February, 1993, Anuhco repaid the $2.8 million loan and purchased AFS's stock in Crouse. Following that purchase, Anuhco became the owner of 100% of the outstanding stock in Crouse. Anuhco also owns 100% of the outstanding stock in AFS.

AFS has no current ownership interest in Crouse. AFS does not own subsidiary companies.

Anuhco rents corporate office space from AFS. Crouse leases a transportation terminal from AFS and has purchased three such terminals from AFS in the past. AFS's Disclosure Statement [1] reflects that prior to August of 1988, AFS was the principal trucking operation of American Carriers, Inc. During the first quarter of 1988, AFS employed over 9,000 persons including over 6,900 truck drivers and terminal employees; and operated 258 freight terminals. In its First Amended Complaint for Declaratory and Injunctive Relief, filed in this adversary proceeding, AFS states that "[p]rior to its bankruptcy, AFS was engaged in business as a common carrier of property by motor vehicle . . . ."

Currently, AFS does not own or operate any tractors, trailers or trucks. AFS does not have current, effective tariffs on file with the ICC, nor does it have a current certificate of operation from the ICC. AFS does not have any current insurance policies on file with the ICC for bodily injury, property damage and cargo liability. AFS does not advertise, dispatch, solicit loads, prepare original freight bills or documentation, bill for current invoices, or prepare bills of lading.

Crouse owns and operates 48 terminals, 483 tractors and trucks, and 869 trailers. Crouse advertises, dispatches, solicits loads, prepares original freight bills or documentation, bills for current invoices, prepares bills of lading, and undertakes other activities incidental to freight transportation.

## CONCLUSIONS OF LAW

AFS has filed a number of adversary actions in its Chapter 11 bankruptcy, seeking collection of undercharges for past motor vehicle transportation services rendered prior to 1989. On December 3, 1993, the Negotiated Rates Act (Pub.L. No. 103–180, 107 Stat. 2044) became effective ("NRA"). It modified the Interstate Commerce Act, by *inter alia,* allowing shipper-defendants in un-

---

1. The parties stipulated to certain portions of the Disclosure Statement. The Court reviewed the Disclosure Statement in its entirety.

dercharge actions (1) to settle certain undercharge claims through prescribed settlement formulas; (2) to be relieved from all liability above the charges originally billed and paid if the shipper qualifies as a "small-business concern," or a tax-exempt organization, or if the cargo involved in the claim is recyclable materials; or (3) for transportation provided before September 30, 1990, to be free from undercharges, the collection of which the ICC determines to be an unreasonable practice. *See* Section 2(a) and (e) of the NRA, codified at 49 U.S.C. § 10701(f).

AFS contends that the NRA does not apply to it, such that the settlement provisions are not available to the defendant shippers in the adversary actions filed in this bankruptcy. Defendant/shipper Interplastic, along with B.F. Goodrich[2], the ICC and the USA take the position that the NRA does apply to AFS, because it is no longer transporting property.

The salient issue is the meaning of language added by the NRA to 49 U.S.C. § 10701(f), which sets forth the procedures for resolving claims involving unfiled, negotiated transportation rates. That section states in pertinent part:

> (1) In general.—When a claim is made by a **motor carrier of property** (other than a household goods carrier) **providing transportation subject to the jurisdiction of the Commission** under subchapter II of chapter 105 of this title, by a freight forwarder (other than a household goods freight forwarder), or by a party representing such a carrier or freight forwarder **regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier** or freight forwarder **for such transportation,** the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—
>
> (A) the carrier or freight forwarder is **no longer transporting property or is**

**transporting property for the purpose of avoiding the application of this subsection;** ...

49 U.S.C. § 10701(f)(1) [emphasis added].

▮▮ When interpreting a statute, the Court's inquiry must begin with the language in the statute; and where the language is plain, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

Section 10701(f) provides that a respondent to a motor carrier's claim may resolve the dispute by electing certain settlement provisions set out in subsections (2), (3) and (4) of the statute, if the respondent shows that the carrier is no longer transporting property. The Court must first determine which claimants the statute applies to. The statute clearly states that it applies when a "motor carrier of property ... providing transportation subject to the jurisdiction of the Commission" has filed a claim. "Motor carrier" is defined in § 10102(13) of the Interstate Commerce Act as a motor common carrier or a motor contract carrier, which are in turn defined in §§ 10102(14) and (15) of the Interstate Commerce Act. Motor common carrier is defined at § 10102(14), as:

> ... a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both.

And, motor contract carrier similarly is defined at § 10102(15) as someone providing "motor vehicle transportation." Motor vehicle is defined at § 10102(17) as:

> ... a vehicle, machine, tractor, trailer, or semitrailer propelled or drawn by mechanical power and used on a highway in transportation, or a combination determined by the Commission, but does not include a vehicle, locomotive, or car operated only on a rail, or a trolley bus operated by electric power from a fixed overhead wire, and

---

**2.** B.F. Goodrich's pleadings are also filed on behalf of some other defendant shippers: Aristokraft, Inc.; J & S Capital, Inc.; Silver Burdette Press, Inc.; Wilson Jones Company; and Graph-

ic Technology, Inc. In addition, defendant/shipper American Safety Razor has filed an amicus brief that joins in and incorporates the brief filed by Interplastic.

providing local passenger transportation similar to street-railway service.

Finally, transportation is defined at § 10102(26) as including:

(A) a locomotive, car, vehicle, motor vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

Reading these statutory definitions together, it is evident that the "motor carriers of property" that come within the purview of § 10701(f) are those that provide motor vehicle transportation, that is those who move property by using motor vehicles, tractors, trucks or trailers drawn or propelled by mechanical power on highways. Clearly, at the time AFS's undercharge claims arose, it was a motor carrier of property. AFS's undercharge claims resulted from it providing motor vehicle transportation. As such, AFS's claims clearly fall within the language in § 10701(f)(1).

■ Therefore, the Court must now determine whether AFS is "no longer transporting property" within the meaning of § 10701(f)(1)(A). The defendants urge the Court to find the language unambiguous and consider the plain meaning of "no longer transporting property," as no longer providing motor vehicle transportation. AFS urges the Court to find the language ambiguous and to utilize the statutory definition of "transportation" found at 49 U.S.C. § 10102(28), which would include not only trucking, but services related to trucking. If the Court adopts AFS's interpretation, AFS may be still "transporting" property, in its capacity as the owner or lessor of six freight terminals, and thus the provider of services related to storage or interchange of property. If the Court agrees with the defendants' interpretation, AFS is no longer transporting property, as there is no dispute that AFS is

no longer a trucking company or providing motor vehicle transportation.

AFS's analysis fails in several respects. First, it is not clear that AFS is providing transportation even under the broad definition in § 10102(28). Transportation is defined as owning or using an instrumentality to move property **and** providing services related to that movement. The plain language of the statute indicates that those who provide services relating to the movement of property but who do not own or use instrumentalities for the movement of property, do not provide transportation. The statute defines transportation as having two components, movement and related services.

Even if AFS is providing "transportation" within the meaning of § 10102(26), AFS is not providing "motor vehicle transportation." AFS neither owns, uses nor operates motor vehicles, trucks, trailers or other mechanically powered instrumentalities propelled or drawn on a highway in the movement of property. AFS provides a tangential service, it owns or leases storage facilities to others who store property in transit. Thus, AFS is not providing "motor vehicle transportation."

The court in *PNH Corp. v. Hullquist Corp.*, 843 F.2d 586 (1st Cir.1988), likewise found that "motor vehicle transportation" was not being provided. In that case, a shipper brought suit against carriers under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 11707, to recover for a loss of cargo. The first carrier dropped off the load at Hullquist, which operated a storage facility where the cargo was stored until the second carrier picked it up. Hullquist argued that it was not a common or contract carrier within the meaning of the Carmack Amendment and thus bore no liability for the loss. The court found that storage is a service related to the motor carrier's carriage and delivery and thus constituted transportation, as defined by § 10102(28). *Id.* at 590. The court seemed to ignore the plain language of § 10102(28), which defined transportation as providing the instrumentality **and** related services. In any case, the court went on to indicate, in dictum, that even if Hullquist was providing transportation, it was not providing "motor vehi-

cle" transportation, precisely because it was not using a vehicle, tractor, or trailer on a highway. *Id.* at 591. Thus, the court concluded that Hullquist's activities were outside the scope of the Carmack Amendment because a warehouseman is not engaging in motor vehicle transportation. *Id.*

Next, the Court must determine whether the fact that AFS is no longer providing motor vehicle transportation is equivalent to "no longer transporting property" within § 10701(f)(1)(A). The parties in this case are at odds as to the meaning of "no longer transporting property." The defendants contend that it means the same thing as the language in the body of § 10701(f), that the motor carrier is no longer providing motor vehicle transportation.[3] AFS contends that it means that the carrier is no longer providing any transportation, including both movement and services related to movement of property.

■ The Court finds that there is no ambiguity in the language of § 10701(f), and "no longer transporting property" means no longer providing motor vehicle transportation. The language of § 10701(f)(1)(A) states that the settlement provisions apply when the "carrier" is "no longer transporting property." But, it is clear from the context of the statute, that "carrier" is merely a shorthand reference to "motor carrier of property," the description of the type of claimants in the body of § 10701(f)(1). Thus, it is evident that the settlement provisions apply when a motor carrier of property has made an undercharge claim, and that motor carrier of property is no longer providing motor vehicle transportation. It follows then, that AFS is "no longer transporting property" such that the respondents to AFS's undercharge claims are entitled to elect into certain settlement provisions.[4]

■ AFS alternatively argues that even if AFS is no longer transporting property, the activities and operations of Crouse are "sufficient to confer status upon AFS as an entity

transporting property." Crouse and AFS are wholly owned by Anuhco. AFS has no ownership interest in Crouse, nor does Crouse have any ownership interest in AFS. Anuhco, AFS and Crouse do share some directors and officers. AFS and Crouse share no identity of customers, rates, routes or employees. Anuhco, AFS and Crouse file consolidated income tax returns and their financial results are consolidated in Anuhco's filings with the Securities and Exchange Commission. AFS leases a terminal to Crouse and has sold three other terminals to Crouse. AFS and Crouse have no other affiliation.

AFS contends that their contacts are sufficient to render AFS and Crouse the same entity, and relies on the "single system doctrine" citing *Louisville & Jeffersonville Bridge and R.R. Co. Merger, Etc.*, 295 I.C.C. 11 (1956), and *Alleghany Corp. v. Breswick and Co.*, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957). That doctrine is an interpretation of 49 U.S.C. § 11343(a)(4) which provides that a noncarrier may not acquire control of at least two carriers subject to ICC jurisdiction, unless that noncarrier obtains approval and authorization of the ICC. The doctrine provides that if a noncarrier acquires a single established carrier system, the noncarrier is not required to get the ICC's blessing if the single carrier system happens to be comprised of a number of corporate entities. AFS contends that Crouse, Anuhco and AFS are part of a single carrier system.

It is unnecessary to further examine AFS's relationship with Crouse and Anuhco, because an extension of the single system doctrine to the issue at hand would do violence to the plain meaning of § 10701(f). For the reasons discussed previously, the Court must compare the nature of AFS's transportation at the time of the undercharges, with the nature of its transportation now. At the time of the undercharges, AFS was a trucking company, moving property. The under-

---

3. The defendants argue that transportation is limited to trucking, that is the movement of property, and does not include services related to the movement of property, as § 10102(28) suggests.

4. It should be noted that some of the respondents claim that they are small business concerns and

thus exempt from any liability for undercharges pursuant to 49 U.S.C. § 10701(f)(9)(A). The Court does not decide in this opinion which respondents are small business concerns exempt from the provisions of this statute.

charges were based on AFS's activity, not the activity of Crouse or any other entity. The Court must focus on the substance of what AFS was doing before, with the substance of what it is doing now. Changes in form are irrelevant. The fact that AFS may have changed the form of its operation, the fact that it may have changed ownership or management is not what is important. The critical inquiry is whether AFS is still transporting property in the sense that it was at the time of the undercharges. It is not. And, the fact that in the interim AFS has ceased trucking and has been acquired by a company that also owns a trucking company, does not mean that AFS is still transporting property as it had before. Thus, whether AFS tries to bootstrap onto Crouse's trucking activities through an "imputation" theory, a negative piercing of the corporate veil, the single system doctrine, or some other theory, is inapposite.[5] The Court will only focus on AFS's activities at the time of the undercharges and AFS's activities now. If an undercharge claimant can defeat application of the NRA by changing its ownership, then the second clause of § 10701(f)(1), **"transporting property for the purpose of avoiding the application of this subsection;"** is rendered meaningless.

**IT IS THEREFORE ORDERED BY THE COURT** that AFS is no longer transporting property within the meaning of 49 U.S.C. § 10701(f)(1)(A), and the Negotiated Rates Act of 1993 applies to AFS.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

---

**5.** AFS's single system theory is confounded by Anuhco's failure to make any of the requisite filings with the ICC for a consolidation or merger of entities; nor did Crouse adopt AFS's tariffs as the statute requires a carrier's successor in interest to do. *See* 49 U.S.C. § 11343.